10-0910-cv
Scandinavian Reins. Co. Ltd. v. St. Paul Fire & Marine Ins. Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2010

(Argued: January 28, 2011          Decided: February 3, 2012)

Docket No. 10-0910-cv

-------------------------------------

SCANDINAVIAN REINSURANCE COMPANY LIMITED,

Petitioner-Appellee,

- v -

SAINT PAUL FIRE AND MARINE INSURANCE COMPANY; ST. PAUL
REINSURANCE COMPANY, LIMITED; ST. PAUL RE (BERMUDA) LIMITED,

Respondents-Appellants.

-------------------------------------

Before:   SACK and LIVINGSTON, Circuit Judges, and MURTHA,
          District Judge.[*]

Appeal from a decision of the United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge) granting a petition to vacate an arbitral award under the Federal Arbitration Act on the basis of "evident partiality." 9 U.S.C. § 10(a)(2). The district court concluded that vacatur was warranted because two of the three members of the arbitral panel failed to disclose their simultaneous service as arbitrators in another proceeding in which a common witness, similar legal issues, and a related party were involved. We conclude that

_____

[*] The Honorable J. Garvan Murtha, of the United States District Court for the District of Vermont, sitting by designation.

there was insufficient evidence before the district court on which to base a finding of "evident partiality." We therefore reverse and remand with instructions to confirm the arbitral award.

PATRICIA A. MILLETT, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; Barry A. Chasnoff, Rick H. Rosenblum, David R. Nelson, Akin Gump Strauss Hauer & Feld LLP, San Antonio, TX; Michael C. Small, L. Rachel Helyar, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA, for Petitioner-Appellee.

G. ERIC BRUNSTAD, JR., Collin O'Connor Udell, Matthew J. Delude, Joshua W.B. Richards, Wayne I. Pollock, Dechert, LLP, Hartford, CT; David M. Raim, William K. Perry, Joy L. Langford, Chadbourne & Parke LLP, Washington, D.C.; John F. Finnegan, Chadbourne & Parke LLP, New York, NY, for Respondents-Appellants.

SACK, Circuit Judge:

The primary question presented on this appeal is whether the failure of two arbitrators to disclose their concurrent service as arbitrators in another, arguably similar, arbitration constitutes "evident partiality" within the meaning of the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 10(a)(2). Respondents Saint Paul Fire and Marine Insurance Company; St. Paul Reinsurance Company, Limited; and St. Paul Re Limited (collectively, "St. Paul") appeal from a decision of the United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge) granting a petition by Scandinavian Reinsurance Company Limited ("Scandinavian") to vacate an arbitral award rendered in St. Paul's favor and denying a cross-

2

petition by St. Paul to confirm the same award. St. Paul had initiated the arbitration (the "St. Paul Arbitration") to resolve a dispute concerning the interpretation of the parties' reinsurance contract.

In deciding that vacatur was warranted on "evident partiality" grounds, the district court relied principally on the fact that two of the three members of the arbitral panel in the St. Paul Arbitration -- Paul Dassenko and Peter Gentile -- had failed to disclose that they were simultaneously serving as panel members in another arbitration proceeding: the "Platinum Arbitration." The court observed that the Platinum Arbitration "overlapped in time, shared similar issues, involved related parties, [and] included . . . a common witness." Scandinavian Reins. Co. v. St. Paul Fire & Marine Ins. Co., 732 F. Supp. 2d 293, 307-08 (S.D.N.Y. 2010) ("Scandinavian") (footnotes omitted). The district court determined that "these factors indicate that Dassenko and Gentile's simultaneous service as arbitrators in [both proceedings] constituted a material conflict of interest." Id. at 308. The court then concluded that the arbitrators' failure to disclose this conflict of interest required vacatur of the arbitral award.

We disagree. Evident partiality may be found only "'where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'" Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S., 492 F.3d 132, 137 (2d Cir. 2007) (internal

3

quotation mark omitted) (quoting <u>Morelite Constr. Corp. v. N.Y.C.</u> <u>Dist. Council Carpenters Benefits Funds</u>, 748 F.2d 79, 84 (2d Cir. 1984)).  We conclude that, under the circumstances of this case, the fact of Dassenko's and Gentile's overlapping service as arbitrators in both the Platinum Arbitration and the St. Paul Arbitration does not, in itself, suggest that they were predisposed to rule in any particular way in the St. Paul Arbitration.  As a result, their failure to disclose that concurrent service is not indicative of evident partiality.  We therefore reverse and remand with instructions to the district court to confirm the award.

**BACKGROUND**

The facts are recited at length in the district court's opinion, <u>see</u> <u>Scandinavian</u>, 732 F. Supp. 2d at 295-302, and we borrow freely from that description here.  The facts are undisputed unless otherwise noted.

<u>The Reinsurance Contracts</u>

On August 21, 1999, Scandinavian and St. Paul -- both reinsurance companies -- entered into a specialized type of reinsurance contract known as a stop-loss retrocessional agreement.[1]  <u>See</u> Retrocessional Casualty Aggregate Stop Loss

---

[1] The district court explained:

> Reinsurance is insurance for insurance companies[.] [T]he ceding company transfers or "cedes" all or part of the risk it underwrites to the reinsurer -- another insurance company that is willing to assume that risk. In a retrocessional agreement, a reinsurer cedes a portion of its risk to another reinsurer.  A

Agreement AR 11914 (the "Agreement")). Under the Agreement, St. Paul ceded to Scandinavian some of the reinsurance liabilities that St. Paul had assumed from other insurance companies under reinsurance business that had been, or would be, written by St. Paul between January 1, 1999, and December 31, 2001.

In exchange for Scandinavian's assumption of these liabilities, St. Paul became obligated to pay premiums to Scandinavian. But the Agreement contemplated that instead of paying the premiums to Scandinavian directly, St. Paul would provisionally retain those funds within an "experience account,"[2] where the funds would accumulate interest. Any amounts that Scandinavian became obligated to pay St. Paul based on the assumed liabilities would first be paid out of that account. Only if the experience account became fully depleted would Scandinavian have to pay St. Paul out of its own funds.

The Agreement contained a dispute-resolution clause providing for binding arbitration of "any dispute arising out of the interpretation, performance or breach of this Agreement, including the formation or validity thereof." Agreement at 11.

retrocessional agreement is effectively reinsurance for reinsurance.

Scandinavian, 732 F. Supp. 2d at 295 n.2 (citation omitted); see generally Unigard Sec. Ins. Co. v. N. River Ins. Co., 4 F.3d 1049, 1053-54 (2d Cir. 1993) (describing the reinsurance business).

[2] Although termed an "account," the experience account is a purely notional bookkeeping concept.

It required that such disputes be "submitted for decision to a panel of three arbitrators" -- two party-appointed arbitrators and an umpire -- all of whom would be "disinterested active or former executive officers of insurance or reinsurance companies or Underwriters at Lloyd's, London." Id.

Emergence of the Parties' Dispute

In January 2002, Scandinavian entered into "run-off,"[3] thereby ceasing to underwrite new business. St. Paul also entered into run-off later the same year.

After St. Paul requested that Scandinavian indemnify it for much of its loss, two disputes emerged between the parties concerning the Agreement's interpretation. First, the parties could not agree on whether they had intended the Agreement to limit the volume of liability assumed by Scandinavian. Scandinavian argued that the parties had intended the Agreement to be "finite," and that the maximum possible loss to Scandinavian that the parties had contemplated was about $21 million.[4] St. Paul contended, however, that the Agreement contained no express limitation on the extent of risk that

---

[3] According to the parties, a reinsurer is said to be in "run-off" status when it ceases to write new reinsurance contracts but continues to administer its existing obligations under previously issued contracts. It is essentially an "orderly wind-down" of the company's reinsurance business. Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp., 945 F.2d 1226, 1235 (2d Cir. 1991), cert. denied, 503 U.S. 985 (1992).

[4] Scandinavian also contends that, conversely, the maximum possible gain to Scandinavian that the parties had contemplated was $3 million.

6

Scandinavian had assumed and that no such limitation should be read into the Agreement. St. Paul ultimately sought to charge Scandinavian with losses of approximately $290 million.

Second, the parties could not agree on whether the Agreement provided for a single experience account, or instead three separate experience accounts (i.e., one for each year covered by the Agreement). Scandinavian argued that the Agreement provided for one, while St. Paul argued that there were three separate accounts.

### The Arbitrators and Their Disclosures

To resolve these disputes, in September 2007, St. Paul demanded arbitration. In accordance with the terms of the Agreement, the parties proceeded to select the three members of the arbitral panel. Scandinavian appointed Jonathan Rosen, and St. Paul appointed Peter Gentile. Paul Dassenko was selected to serve as umpire.[5] The parties accepted Dassenko's appointment on November 29, 2007, following their receipt of his responses to a disclosure questionnaire.

---

[5] The parties' descriptions regarding who was responsible for selecting Dassenko appear to be inconsistent. St. Paul states that each party proposed five possible candidates for umpire, and that Dassenko was jointly selected by the parties because he had been included on each party's list. Scandinavian states, instead, that the two party-appointed arbitrators, Rosen and Gentile, were the ones responsible for selecting Dassenko. The district court, without noting this inconsistency, accepted Scandinavian's representation that "Rosen and Gentile selected Paul Dassenko to be the umpire." Scandinavian, 732 F. Supp. 2d at 296. There is no need to inquire further into this matter, however, because it does not affect the outcome on appeal.

7

Although the Agreement did not require the arbitrators to be affiliated with any particular arbitral association, all three arbitrators were certified by the AIDA Reinsurance and Insurance Arbitration Society ("ARIAS"). ARIAS has promulgated ethical guidelines for certified arbitrators, including Canon IV, which instructs arbitrators to "disclose any interest or relationship likely to affect their judgment" and to resolve any doubt about whether to disclose "in favor of disclosure." ARIAS U.S., Code of Conduct - Canon IV, http://www.arias-us.org/index.cfm?a=30 (last visited Dec. 20, 2011). In accordance with those guidelines, each of the arbitrators made initial disclosures to the parties. The form of those disclosures differed.

Dassenko, the umpire, responded in writing to a nine-page questionnaire jointly submitted by the parties.[6] See [J.A. 112-30] Umpire Questionnaire (Nov. 21, 2007). In addition to disclosing his past employment at several firms affiliated with either St. Paul or Scandinavian,[7] Dassenko noted that it was "likely" that he had "transacted or sought to transact business

_____

[6]    The questionnaire appears to have been modeled on a sample disclosure form prepared and disseminated by ARIAS. See ARIAS U.S., Arbitrators/Umpire Questionnaire, http://www.arias-us.org/forms/arias-arbitrator-umpire-disclosure-questionaire.doc (last visited Dec. 20, 2011).

[7]    The parties' questionnaire identified some fifty-eight entities within the "Travelers Group of Insurance Companies," to which St. Paul belongs, and some sixty-two entities within the "White Mountains Insurance Group Companies," to which Scandinavian belongs. See Umpire Questionnaire ¶ 6(A).

8

with most of the entities" listed by the parties on the questionnaire, including St. Paul and Scandinavian themselves. Id. ¶ 6(c). Dassenko represented, however, that he had never had any involvement with the subject matter of the dispute, nor did he have any significant professional or personal relationship with any officers, directors, or employees of the parties.[8] Dassenko also indicated that he had previously served as an arbitrator in more than 150 insurance or reinsurance arbitrations, including two arbitrations in which Rosen had also been an arbitrator. At the prompting of St. Paul's counsel, Dassenko made additional disclosures by email on November 27, 2007, with respect to certain matters that he had forgotten to include in responding to the questionnaire.

The two party-appointed arbitrators made their initial disclosures orally at an organizational meeting held on February 25, 2008. Both Rosen, the Scandinavian-appointed arbitrator, and Gentile, the St. Paul-appointed arbitrator, made a variety of disclosures about past and present employment, their relationships to the parties or their law firms, and their participation as witnesses or arbitrators in other proceedings

---

[8] In the context of describing the umpire questionnaire, the district court noted that "Dassenko did not mention working with Gentile on any arbitration nor did he disclose any relationship with Platinum." Scandinavian, 732 F. Supp. 2d at 297. We note that it would have been impossible for Dassenko to have made those specific disclosures at that time, however, because the Platinum Arbitration did not begin until more than six months later.

9

involving the same parties, their affiliates, their law firms, or the same arbitrators.[9]

After Rosen and Gentile made their respective disclosures, Dassenko -- speaking on behalf of the panel -- "urge[d] [the parties] to . . . determine whether there's anything else that deserves more attention in terms of disclosures on behalf of this [p]anel." Tr. at 15 (Feb. 25, 2008). Dassenko also acknowledged, on behalf of the panel, the arbitrators' "ongoing responsibility" to make disclosure if and when they "become aware of relationships or situations that require additional disclosure." Id. The parties agreed to accept the panel as constituted. They did not ask any other questions relating to the arbitrators' disclosures at that time.

As the St. Paul Arbitration progressed, the arbitrators made various additional disclosures. On July 18, 2008, Gentile informed the parties that during the time he worked at a specified firm, other staff members at that firm might have reviewed the same contract that was at issue in the St. Paul Arbitration. During a motion hearing held on May 2, 2009, he and Rosen disclosed that they had known Scandinavian's expert witness professionally and personally for many years. And on June 23, 2009, Gentile told the parties that he had met one of

---

[9] For example, Gentile disclosed that he had previously appeared as a fact witness in an arbitration in which Dassenko was a party arbitrator and in which the opposing party was an affiliate of Scandinavian.

10

Scandinavian's witnesses, Bart Hedges, "a few times in the past, mainly in Bermuda." Tr. at 1832 (June 23, 2009).

The umpire, Dassenko, made further disclosures on March 28, 2009; June 24, 2009; and July 1, 2009. For example, Dassenko explained that his private equity firm had been retained to assist with the run-off of an insurer that had a potential dispute with St. Paul's parent company, and that he had prior business contacts with a St. Paul underwriter whose name had been mentioned during the evidentiary hearing.

<u>The Arbitral Award</u>

The arbitration proceedings addressed the question whether the parties had agreed to limit Scandinavian's total financial exposure under the Agreement. St. Paul argued that the Agreement was valid and that its express terms -- which contained no explicit limit -- should be enforced. Scandinavian sought rescission of the Agreement on the grounds of misrepresentation, or in the alternative, for rescission or reformation based on unilateral or mutual mistake.

During the final evidentiary hearing, held between June 15, 2009, and July 1, 2009, fourteen witnesses testified. Among them was Bart Hedges, who then served as president and CEO of Scandinavian and who had been an employee of Scandinavian at the time the Agreement was executed.

The arbitral panel issued their award (the "Award") on August 19, 2009. A majority of the panel[10] concluded that the Agreement was valid and should be enforced according to its terms, thereby exposing Scandinavian to an aggregate limit of approximately $290 million in liability. With respect to several other matters, including the question of whether the Agreement had created one experience account or three, the panel ruled unanimously in favor of St. Paul.

The Platinum Arbitration and its Non-Disclosure

While proceedings in the St. Paul Arbitration were ongoing, another reinsurance arbitration -- the Platinum Arbitration -- began. It involved a reinsurance dispute between PMA Capital Insurance Company and several of its affiliates (collectively, "PMA") and Platinum Underwriters Bermuda, Ltd. ("Platinum"). Platinum was PMA's re-insurer. In June 2008 -- about three months after the organizational meeting was held in the St. Paul Arbitration -- Platinum demanded arbitration against PMA in order to interpret a reinsurance contract between those two parties.

Two of the arbitrators from the St. Paul Arbitration -- Gentile, St. Paul's party-appointed arbitrator, and Dassenko, the umpire -- were subsequently selected to serve on the panel in the

_____

[10] Scandinavian asserts, and St. Paul does not dispute, that this majority included Gentile and Dassenko but not Rosen. Although the Award itself does not indicate which arbitrators joined in the holding, we, like the district court, see Scandinavian, 732 F. Supp. 2d at 299 n.43, have no reason not to accept that Dassenko and Gentile were in the majority.

Platinum Arbitration. Platinum selected Gentile as its party-appointed arbitrator, and Dassenko, there too, was chosen to serve as umpire. Those appointments occurred sometime between early June and late September, 2008. The organizational meeting for the Platinum Arbitration was held on September 23, 2008. The evidentiary hearing was held in three one-day sessions in March through May, 2009. The Platinum Arbitration ended with the issuance of an award on May 22, 2009, about four weeks before the start of the evidentiary hearing in the St. Paul Arbitration.[11] The Platinum Arbitration was therefore concurrent with the St. Paul Arbitration, as the St. Paul Arbitration began prior to, and ended after, the Platinum Arbitration.

Despite the many disclosures made by Dassenko and Gentile during the St. Paul Arbitration -- including disclosures about the specific matter of their participation in other arbitrations involving the same arbitrators -- it is undisputed that neither Dassenko nor Gentile ever disclosed to the parties the fact of their concurrent service in the Platinum Arbitration. See Scandinavian, 732 F. Supp. 2d at 298. And although Dassenko

---

[11] Following the award in the Platinum Arbitration, PMA filed a petition to vacate that award in the United States District Court for the Eastern District of Pennsylvania. The district court granted the petition on the grounds that the award was "completely irrational," insofar as the award purported to strike out part of the parties' contract without any authority for doing so. PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd., 659 F. Supp. 2d 631, 636-39 (E.D. Pa. 2009). The district court's decision to vacate the award was upheld on appeal. See PMA Capital Ins. Co. v. Platinum Underwriters Bermuda, Ltd., 400 F. App'x 654 (3d Cir. 2010).

13

and Gentile each disclosed to Platinum and PMA that they were then serving together as arbitrators in another matter -- the arbitration at issue here -- neither of them specifically identified St. Paul or Scandinavian as the parties involved in it.[12]  Id. at 300.

> ### Similarities Between the Platinum Arbitration and the St. Paul Arbitration

As described by the district court, the Platinum Arbitration appeared to resemble the St. Paul Arbitration in several ways.

First, as noted above, Gentile served as the party-appointed arbitrator for the claimant in both proceedings, and Dassenko presided as umpire over each panel.  See id. at 300.

Second, although St. Paul was not itself a party to the Platinum Arbitration, St. Paul's business was related in several ways to Platinum's.  See id. at 301-02.  Most importantly, after St. Paul contributed its rights to renew its existing reinsurance contracts to Platinum's parent in 2002, Platinum succeeded St. Paul as PMA's reinsurer.  Moreover, the core of Platinum's claim in the Platinum Arbitration was that, in calculating the balance of the "experience account" created by the Platinum-PMA contract, Platinum was entitled to carry forward certain losses that had been incurred by St. Paul under St. Paul's previous reinsurance

---

[12] To the contrary, Gentile represented -- incorrectly -- to Platinum and PMA that the Platinum Arbitration was the first matter that he would serve on that would involve St. Paul in any way.

14

contract with PMA.[13]  See id. at 299; PMA Capital Ins. 659 F. Supp. 2d at 639 (noting that the interpretation of the contract's "Deficit Carry Forward Provision" was the "gravamen" of the parties' dispute in the Platinum Arbitration).  St. Paul asserts, however, that the district court mischaracterized the facts and that Platinum is not "truly related" to it in any meaningful way.  Appellants' Br. at 49.

Third, Hedges -- a past employee of both Scandinavian and Platinum -- testified in both proceedings. See Scandinavian, 732 F. Supp. 2d at 306-07 & nn.112, 113.  Hedges' testimony in each proceeding related to two distinct periods of past employment.  Nonetheless, the district court posited that Dassenko and Gentile could have concluded that Hedges testified inconsistently -- and therefore lacked credibility -- insofar as, in the Platinum Arbitration, Hedges testified in favor of "interpreting the Platinum[-PMA] Agreement as written," while in

---

[13] The district court also took note of two other, more indirect, connections between St. Paul and Platinum.

First, at the time of the Platinum Arbitration, a St. Paul affiliate known as "Travelers Special Services" was under contract with a Platinum affiliate to "administer claims and to provide actuarial and administrative services."  Scandinavian, 732 F. Supp. 2d at 302 (internal quotation marks omitted).  This arrangement was not at issue in the Platinum Arbitration.

Second, after the initial public offering of Platinum's parent holding company in 2002, some 180 employees left St. Paul for Platinum.  Among them was one St. Paul employee who was centrally involved in negotiating the Agreement between St. Paul and Scandinavian, and who later served as a witness in the St. Paul Arbitration.  Id.

the St. Paul Arbitration, Hedges testified in favor of "interpreting the Scandinavian[-St. Paul] Agreement in light of Scandinavian[]'s _intent_ at the time it entered into the agreement."  Id. at 308 (emphasis in original).  St. Paul, for its part, argues that "the involvement of Hedges as a witness in the two unrelated arbitrations is . . . irrelevant."  Appellants' Br. at 51.

Fourth, the district court determined that the two arbitrations "shared similar [legal] issues."  Id. at 307.

> [B]oth arbitrations required the arbitrators
> to (1) consider whether a finite[14]
> retrocessional agreement should be enforced
> according to the express terms of the
> agreement or whether the agreement should be
> interpreted in light of the parties'
> intentions at the formation of the agreement
> and (2) interpret contract language regarding
> the creation of experience accounts.

Id. at 307 n.118.  Again, however, St. Paul criticizes the district court's assessment of similarity, arguing that it is couched at an "overly broad" level of generality.  Appellants' Br. at 50.

The District Court Proceedings

---

[14] On appeal, Scandinavian persists in describing the Agreement as "finite," see Appellee's Br. at 4, 11, 39, and the district court described the Agreement using the same term, see Scandinavian, 732 F. Supp. 2d at 295, 307 n.118.  It appears, however, that finiteness -- i.e., whether the "the amount of risk transferred from St. Paul to Scandinavian [] was limited," id. at 295 -- was the very matter that was disputed in the St. Paul Arbitration and which was ultimately resolved favorably to St. Paul.

16

Scandinavian represents that it first became aware that Dassenko and Gentile had served together on the Platinum Arbitration two months after the Award was issued.[15]  On November 16, 2009, Scandinavian filed a petition to vacate the Award in the United States District Court for the Southern District of New York pursuant to the FAA on grounds of evident partiality.  See 9 U.S.C. § 10(a)(2).  Scandinavian asserted that the fact that Dassenko and Gentile had failed to disclose their concurrent service in the Platinum Arbitration -- a proceeding that, Scandinavian contended, involved "a common witness, similar disputed issues and contract terms, and the company that succeeded to the business of St. Paul," Am. Pet. to Vacate Arbitration Award at 2 (Dec. 21, 2009), at J.A. 202 -- reflected bias by those arbitrators in St. Paul's favor.

On December 30, 2009, St. Paul opposed Scandinavian's petition and filed a cross-petition to confirm the arbitration award under 9 U.S.C. § 9.  St. Paul did not dispute that Dassenko and Gentile had failed to disclose their concurrent service in the Platinum Arbitration, arguing instead that there was no basis upon which to conclude that nondisclosure was indicative of bias.

On February 23, 2010, the district court granted Scandinavian's petition and denied St. Paul's cross-petition, concluding that the arbitrators' failure to disclose their

---

[15] Scandinavian represents that it learned of the concurrent service after its counsel discovered the district court's decision vacating the award in the Platinum Arbitration.

17

concurrent service in the Platinum Arbitration constituted evident partiality. See Scandinavian, 732 F. Supp. 2d at 307-09. The court observed that the two arbitrations "were presided over by two common arbitrators, overlapped in time, shared similar issues, involved related parties, [and] included Hedges as a common witness." Id. at 307-08 (footnotes omitted). The court further reasoned:

> By participating in both the [St. Paul] Arbitration and the Platinum[] Arbitration, Dassenko and Gentile placed themselves in a position where they could receive ex parte information about the kind of reinsurance business at issue in the [St. Paul] Arbitration, be influenced by recent credibility determinations they made as a result of Hedges's testimony in the Platinum[] Arbitration, and influence each other's thinking on issues relevant to the [St. Paul] Arbitration. By failing to disclose their participation in the Platinum[] [A]rbitration, Dassenko and Gentile deprived Scandinavian[] of an opportunity to object to their service on both arbitration panels and/or adjust their arbitration strategy.

Id. at 308 (footnote omitted).

The court also contrasted Dassenko's and Gentile's failure to disclose their concurrent service in the Platinum Arbitration with the many "other less significant or temporally remote relationships that Dassenko and Gentile considered important enough to disclose," id. at 308-09, and suggested that that comparison "strengthened" the court's conclusion that Dassenko and Gentile should have informed the parties of their simultaneous service, id.

18

The district court concluded that "[t]aken together, these factors indicate that Dassenko and Gentile's simultaneous service as arbitrators" in the two proceedings "constituted a material conflict of interest."  Id. at 308.  And because that conflict had not been disclosed, the court decided, the nondisclosure met this Circuit's test for evident partiality.  Id. at 309 (citing Applied Industrial, 492 F.3d at 138).  The court vacated the Award and remanded the matter for arbitration before a new arbitral panel.  Id.

St. Paul appeals.

**DISCUSSION**

I.   Review Of Arbitral Awards

A.   <u>Applicability of the New York Convention</u>

The FAA does not "independently confer subject matter jurisdiction on the federal courts."  <u>Durant, Nichols, Houston, Hodgson & Cortese-Costa, P.C. v. Dupont</u>, 565 F.3d 56, 63 (2d Cir. 2009).  "[T]here must be an independent basis of jurisdiction before a district court may entertain petitions" to confirm or vacate an award under the FAA.  Id. (internal quotation marks).  In this case, the district court had subject-matter jurisdiction under 9 U.S.C. § 203, which provides federal jurisdiction over actions to confirm or vacate an arbitral award that is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").  The New York

Convention applies in this case because Scandinavian is a foreign corporation. See 9 U.S.C. § 202.

Because the Award in the St. Paul Arbitration was entered in the United States, however, the domestic provisions of the FAA also apply, as is permitted by Articles V(1)(e) and V(2) of the New York Convention. See Zeiler v. Deitsch, 500 F.3d 157, 164 (2d Cir. 2007) (describing overlap of New York Convention and the FAA); Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 19-23 (2d Cir. 1997), cert. denied, 522 U.S. 1111 (1998). "[T]he FAA and the New York Convention work in tandem, and they have overlapping coverage to the extent that they do not conflict." Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 102 n.1 (2d Cir. 2006) (internal quotation marks omitted). Neither party disputes that section 10 of the FAA governs the issues before us on this appeal. See 9 U.S.C. § 10.

B. Standards of Review

"When reviewing a district court's decision to vacate an arbitration award, we review findings of fact for clear error and questions of law de novo."[16] Applied Industrial, 492 F.3d at 136; see also Zeiler, 500 F.3d at 164.

---

[16] The parties dispute whether the appropriate standard of review for conclusions regarding mixed questions of law and fact is de novo or clear error in the context of petitions to vacate arbitration awards. Because we conclude that the result below rests on legal error, we need not reach this question.

A court reviewing an arbitration award under the FAA "can confirm and/or vacate the award, either in whole or in part." D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 104 (2d Cir. 2006). But a petition brought under the FAA is "not an occasion for de novo review of an arbitral award." Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004). A court's review of an arbitration award is instead "severely limited," ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co., 564 F.3d 81, 85 (2d Cir. 2009), so as not to frustrate the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation," Rich v. Spartis, 516 F.3d 75, 81 (2d Cir. 2008) (internal quotation mark omitted). "This Court has repeatedly recognized the strong deference appropriately due arbitral awards and the arbitral process, and has limited its review of arbitration awards in obeisance to that process." Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC, 497 F.3d 133, 138 (2d Cir. 2007) (citation omitted). Therefore, in order to obtain vacatur of the decision of an arbitral panel under the FAA, a party "must clear a high hurdle." Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010); see also Wallace, 378 F.3d at 189 (referring to the "heavy burden" on the party seeking vacatur under the FAA).

II.  Evident Partiality

A.  Governing Law

The FAA provides that district courts may vacate an arbitral award "where there was evident partiality or corruption

21

in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). In this Circuit, "evident partiality within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." Morelite, 748 F.2d at 84 (internal quotation marks omitted). "Unlike a judge, who can be disqualified in any proceeding in which his impartiality might reasonably be questioned," Applied Industrial, 492 F.3d at 137 (emphasis and internal quotation marks omitted), "an arbitrator is disqualified only when a reasonable person, considering all the circumstances, would have to conclude that an arbitrator was partial to one side," id. (emphasis in original; internal quotation marks omitted). Proof of actual bias is not required, however. See United States v. Int'l Bhd. of Teamsters, 170 F.3d 136, 147 (2d Cir. 1999). A conclusion of partiality can be inferred "from objective facts inconsistent with impartiality." Pitta v. Hotel Ass'n of N.Y.C., Inc., 806 F.2d 419, 423 n.2 (2d Cir. 1986). Of course, a showing of evident partiality "may not be based simply on speculation." Int'l Bhd. of Teamsters, 170 F.3d at 147; see also Three S Del., Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 530 (4th Cir. 2007) (noting that the "asserted bias" may not be "remote, uncertain or speculative" (internal quotation marks omitted)).

The burden of proving evident partiality "rests upon the party asserting bias." Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G., 579 F.2d 691, 700 (2d Cir. 1978) (internal

22

quotation mark omitted). In inquiring whether that burden has been satisfied, the court "'employ[s] a case-by-case approach in preference to dogmatic rigidity.'" Lucent Techs. Inc. v. Tatung Co., 379 F.3d 24, 28 (2d Cir. 2004) (quoting Andros Compania Maritima, 579 F.2d at 700); accord Applied Industrial, 492 F.3d at 137 (analysis takes into account "consider[ation of] all the circumstances").

Among the circumstances under which the evident-partiality standard is likely to be met are those in which an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties. See, e.g., Applied Industrial, 492 F.3d at 136-39. But we have repeatedly cautioned that we are not "quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information." Lucent Techs. Inc., 379 F.3d at 28 (internal quotation mark omitted). We have concluded in various factual settings that the evident-partiality standard was not satisfied because the undisclosed relationship at issue was "too insubstantial to warrant vacating the award." Id. at 30 (internal quotation mark omitted); see also, e.g., id. at 28-29 (no evident partiality where arbitrator failed to disclose either his past work as an expert witness for one of the parties or his past co-ownership of an airplane with another arbitrator); Andros Compania Maritima, 579 F.2d at 696, 701-02 (no evident partiality where umpire failed to disclose his past joint service on nineteen arbitral panels with the president of a firm that acted

23

as one party's agent).  Most recently, in _Applied Industrial_, we considered the standard for obtaining vacatur based upon nondisclosure.  There, we reaffirmed the principle that where "[a]n arbitrator . . . knows of a material relationship with a party" but fails to disclose it, "[a] reasonable person would have to conclude that [the] arbitrator who failed to disclose under such circumstances was partial to one side."  _Applied Industrial_, 492 F.3d at 137; _see also, e.g._, _Lucent Techs. Inc._, 379 F.3d at 28 (recognizing same principle).[17]

B.   _Analysis_

The district court in the case before us concluded that Dassenko's and Gentile's simultaneous service in the Platinum

_____

[17] In _Applied Industrial_ we observed that, up to that time (July 2007) we had not considered whether arbitrators possess a "duty to investigate or disclose potential conflicts of interest," that is, conflicts about which an arbitrator does not yet possess "actual knowledge."  _Id._ at 138.  Turning to that question, and relying upon Justice White's concurring opinion in _Commonwealth Coatings Corp. v. Continental Cas. Co._, 393 U.S. 145 (1968), we reasoned that "arbitrators must take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists."  _Applied Industrial_, 492 F.3d at 138. Accordingly, we articulated a prophylactic rule applicable in circumstances in which an arbitrator thinks a nontrivial conflict may exist, but is not sure:

> [W]here an arbitrator has reason to believe that a nontrivial conflict of interest might exist, he must (1) investigate the conflict (which may reveal information that must be disclosed under _Commonwealth Coatings_) or (2) disclose his reasons for believing there might be a conflict and his intention not to investigate.

_Id._  We concluded that if an arbitrator fails to follow this rule by investigating or disclosing a potential nontrivial conflict of interest, such a failure "is indicative of evident partiality."  _Id._

24

Arbitration constituted a "material conflict of interest" requiring disclosure to the parties.  Scandinavian, 732 F. Supp. 2d at 308.  Relying upon our decisions in Morelite and Applied Industrial, the court then decided that Dassenko and Gentile's failure to disclose that simultaneous service warranted vacatur on evident-partiality grounds.  We disagree.

The evident-partiality standard is, at its core, directed to the question of bias.  Because it was "[not] the purpose of Congress to authorize litigants to submit their cases and controversies" to arbitrators who are "biased against one litigant and favorable to another," Commonwealth Coatings, 393 U.S. at 150 (Black, J.) (plurality opinion), the FAA provides for vacatur of arbitral awards whenever it is "evident" that an arbitrator was "partial[]" to one of the litigating parties.  9 U.S.C. § 10(a)(2).  It follows that where an undisclosed matter is not suggestive of bias, vacatur based upon that nondisclosure cannot be warranted under an evident-partiality theory.  See, e.g., STMicroelecs., N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 74 (2d Cir. 2011) (recognizing in dicta that the "evident partiality" decisions address only "facts bearing on partiality") (emphasis in original); Lagstein v. Certain Underwriter's at Lloyd's, London, 607 F.3d 634, 646 (9th Cir. 2010) (emphasizing that an arbitrator is "required to disclose only facts indicating that he might reasonably be thought biased against one litigant and favorable to another") (emphasis in original; internal quotation marks omitted).

25

Several courts have identified a variety of factors for use in guiding a district court in the application of the evident-partiality test in cases where a party seeks vacatur of an arbitration award because of an arbitrator's nondisclosure. We find those adopted by the Fourth Circuit helpful:

> To determine if a party has established [evident] partiality, a court should assess four factors: "(1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding."

Three S Del., Inc., 492 F.3d at 530 (quoting ANR Coal Co. v. Cogentrix of N.C., Inc., 173 F.3d 493, 500 (4th Cir. 1999), cert. denied, 528 U.S. 877 (1999)). While those factors are useful, we do not view them as mandatory, exclusive or dispositive.[18]

---

[18] Several district courts in this Circuit have employed similar factors that may be considered in undertaking the Morelite analysis. See, e.g., Toroyan v. Barrett, 495 F. Supp. 2d 346, 352 (S.D.N.Y. 2007) (considering "(1) the financial interest the arbitrator has in the proceeding; (2) the directness of the alleged relationship between the arbitrator and a party to the arbitration; (3) and the timing of the relationship with respect to the arbitration proceeding" (internal quotation marks omitted)); In re Arbitration between Carina Int'l Shipping Corp. & Adam Mar. Corp., 961 F. Supp. 559, 568 (S.D.N.Y. 1997) (considering "(1) peculiar commercial practices in the geographic area; (2) an arbitrator's financial interest in the arbitration; (3) the nature of the relationship between the arbitrator and the alleged favored party; and (4) whether the relationship existed during the arbitration").

We conclude that Scandinavian has not met its burden of establishing that Dassenko and Gentile's service in the Platinum Arbitration was indicative of bias in these proceedings so as to constitute a nontrivial conflict of interest.[19] Therefore, the arbitrators' failure to disclose their concurrent service does not require vacatur.

First, as a general matter, we do not think that the fact that two arbitrators served together in one arbitration at the same time that they served together in another is, without more, evidence that they were predisposed to favor one party over another in either arbitration. The undisclosed matter here was overlapping arbitral service, not a "material relationship with a party," Applied Industrial, 492 F.3d at 137, such as a family connection or ongoing business arrangement with a party or its law firm -- circumstances in which a reasonable person could reasonably infer a connection between the undisclosed outside relationship and the possibility of bias for or against a particular arbitrating party. We agree with St. Paul that "the mere fact of [such] overlapping arbitral service suggests nothing inherently negative about the impartiality of the arbitrators."[20]

---

[19] Because Dassenko and Gentile had actual knowledge of the facts surrounding their participation in the Platinum Arbitration, we need only consider whether these facts were sufficiently suggestive of bias. We need not address any potential duty to investigate.

[20] Such overlapping service is not only not a circumstance inherently indicative of bias; it is also not unusual. In specialized fields such as reinsurance, where there are a limited

27

Appellants' Reply Br. at 19. And despite the overlap, there is no indication here that either of the arbitrators was predisposed to rule any particular way in the Scandinavian Arbitration as a result of the Platinum Arbitration.

Scandinavian, in arguing to the contrary, appears to ask us to infer partiality from the arbitrators' overlapping service because the Award in the St. Paul Arbitration was rendered in St. Paul's favor. But the fact that one party loses at arbitration does not, without more, tend to prove that an arbitrator's failure to disclose some perhaps disclosable information should be interpreted as showing bias against the losing party. We have repeatedly said that adverse rulings alone rarely evidence partiality, whether those adverse rulings are made by arbitrators, see, e.g., Thomas C. Baer, Inc. v. Architectural & Ornamental Iron Workers Local Union No. 580, 813 F.2d 562, 565 (2d Cir. 1987), or by judges, see, e.g., Chen v. Chen Qualified Settlement Fund, 552 F.3d 218, 227 (2d Cir. 2009)

---

number of experienced arbitrators, it is common for the same arbitrators to end up serving together frequently. See, e.g., Dow Corning Corp. v. Safety Nat'l Cas. Corp., 335 F.3d 742, 750 (8th Cir. 2003) ("[T]he relatively small number of qualified arbitrators may make it common, if not inevitable, that parties will nominate the same arbitrators repeatedly."), cert. denied, 540 U.S. 1219 (2004); Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co., 307 F.3d 617, 620 (7th Cir. 2002) (discussing the presence of "repeat players" in the arbitration bar), cert. denied, 538 U.S. 961 (2003); Transit Cas. Co. v. Trenwick Reins. Co., 659 F. Supp. 1346, 1353-54 (S.D.N.Y. 1987) ("[T]he number of qualified arbitrators available to sit on insurance arbitration disputes is quite small and . . . arbitrators often sit together on a number of disputes."), aff'd, 841 F.2d 1117 (2d Cir. 1988).

(per curiam) (citing Liteky v. United States, 510 U.S. 540, 555 (1994)).

Nor do we consider any of the identified similarities between the St. Paul Arbitration and the Platinum Arbitration to suggest bias. The district court was correct in observing that the same witness, Hedges, testified in both proceedings; that the interpretation of stop-loss reinsurance agreements containing "experience account" features was at issue in both; and that past and ongoing business relationships existed between Platinum and its affiliates and St. Paul and its affiliates. See Scandinavian, 732 F. Supp. 2d at 307-08. But the fact that one arbitration resembles another in some respects does not suggest to us that an arbitrator presiding in both is somehow therefore likely to be biased in favor of or against any party. Cf. Liteky, 510 U.S. at 561-62 (Kennedy, J., concurring) (observing that the fact that same judge presides over related cases ordinarily does not suggest that judge is biased).

To be sure, as Scandinavian points out, material conflicts of interest need not be direct relationships between arbitrators and parties to the arbitration. As the district court put it, "[a] reasonable person concludes that an arbitrator is partial to one side because the undisclosed relationship is material, not because the material relationship is with a party." Id. at 306. But, in ascertaining whether a relationship is "material" -- or, to use the terminology of Applied Industrial, whether it is "nontrivial" -- we think that a court must focus on

29

the question of how strongly that relationship tends to indicate the possibility of bias in favor of or against one party, and not on how closely that relationship appears to relate to the facts of the arbitration. See Morelite, 748 F.2d at 84 ("[E]vident partiality . . . will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." (internal quotation marks omitted)). In other words, even if a particular relationship might be thought to be relevant "to the arbitration at issue," Scandinavian, 732 F. Supp. 2d at 307, that relationship will nevertheless not constitute a material conflict of interest if it does not itself tend to show that the arbitrator might be predisposed in favor of one (or more) of the parties. As we put it in Applied Industrial, for a relationship to be material, and therefore require disclosure, it must be such that "[a] reasonable person would have to conclude that an arbitrator who failed to disclose [it] . . . was partial to one side." Applied Industrial, 492 F.3d at 137.

We understand, of course, that Gentile was a party-appointed arbitrator in each arbitration, and that he represented the respective claimants (St. Paul and Platinum) in each.[21] We

_____

[21] Before the district court, St. Paul argued in passing that Scandinavian should bear a higher burden for proving partiality as to Gentile than as to Dassenko because Gentile is a party-appointed arbitrator. Several courts have observed that, in tripartite arbitrations such as this one, parties often expect the party-appointed arbitrators to serve as informal advocates for their respective parties in deliberating with the neutral third arbitrator. See, e.g., Sphere Drake, 307 F.3d at 620 (7th

30

also acknowledge the district court's factual findings that Platinum and its affiliates and St. Paul and its affiliates had various past and ongoing business relationships. See Scandinavian, 732 F. Supp. 2d at 301-02. But there is no indication in the record that Gentile was appointed by Platinum at the recommendation of St. Paul, or that Gentile or Dassenko had any special financial or professional interest in ruling in St. Paul's favor as a result of their participation in the Platinum Arbitration.

Scandinavian asserts that vacatur is nonetheless warranted because it was misled by Dassenko's and Gentile's repeated assurances to the parties that they understood themselves obligated to make thorough and ongoing disclosures. In light of those assurances and the many opportunities during

---

Cir. 2002), cert. denied, 538 U.S. 961 (2003); Lozano v. Md. Cas. Co., 850 F.2d 1470, 1472 (11th Cir. 1988); In re Arbitration between Astoria Med. Grp. & Health Ins. Plan of Greater N.Y., 11 N.Y.2d 128, 133-34, 182 N.E.2d 85, 227 N.Y.S.2d 401 (1962). But see Florasynth, Inc. v. Pickholz, 750 F.2d 171, 173 (2d Cir. 1984) (suggesting that party-appointed arbitrators are "not to act merely as partisan advocates"). And for that reason, several of our sister circuits have concluded that the FAA imposes a heightened bar to, or altogether forecloses, an evident-partiality challenge premised solely on the alleged bias of a party-appointed arbitrator in favor of the party who appointed him. See, e.g., Winfrey v. Simmons Foods, Inc., 495 F.3d 549, 551-52 (8th Cir. 2007); Nationwide Mut. Ins. Co. v. Home Ins. Co., 429 F.3d 640, 645-47 & n.8 (6th Cir. 2005); Sphere Drake Ins. Ltd., 307 F.3d at 623. However, because St. Paul has not pressed that argument on appeal -- and because we conclude that Scandinavian's evident-partiality challenge fails in any event -- we need not decide at this time whether the FAA imposes a heightened burden of proving evident partiality in cases in which the allegedly biased arbitrator was party-appointed.

31

the St. Paul Arbitration when the arbitrators' concurrent service in the Platinum Arbitration might have come to mind, Scandinavian argues, "[b]oth arbitrators simply could not have continually failed to see what was right in front of their eyes for so long." Appellee's Br. at 48. The district court, apparently crediting this argument, indicated that in ordering vacatur it relied on the fact that Dassenko and Gentile had informed the parties of many other "less significant or temporally remote relationships." Scandinavian, 732 F. Supp. 2d at 308-09.

We conclude that vacatur was not called for. In the first place, we do not think it appropriate to vacate an award solely because an arbitrator fails to consistently live up to his or her announced standards for disclosure, or to conform in every instance to the parties' respective expectations regarding disclosure.[22] The nondisclosure does not by itself constitute evident partiality. The question is whether the facts that were

---

[22] Even where an arbitrator fails to abide by arbitral or ethical rules concerning disclosure, such a failure does not, in itself, entitle a losing party to vacatur. See, e.g., Positive Software Solutions, Inc. v. New Century Mortg. Corp., 476 F.3d 278, 285 n.5 (5th Cir. 2007); Montez v. Prudential Sec., Inc., 260 F.3d 980, 984 (8th Cir. 2001); ANR Coal Co., 173 F.3d at 499; Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 680-81 (7th Cir. 1983), cert. denied, 464 U.S. 1009 (1983). But see Commonwealth Coatings, 393 U.S. at 149 (Black, J.) (plurality opinion) (describing the AAA disclosure guidelines as "highly significant" to the evident partiality analysis); New Regency Prods., Inc. v. Nippon Herald Films, Inc., 501 F.3d 1101, 1109-10 (9th Cir. 2007) (relying on ethical and arbitral rules as persuasive authority). This is not a case in which the parties have specified a standard for arbitrator impartiality. Accordingly, we need not decide whether noncompliance with such an agreed-upon standard would require a finding of "evident partiality."

32

not disclosed suggest a material conflict of interest.  An approach that examined why an arbitrator failed to disclose a relationship would interject added uncertainty and subjectivity into our evident-partiality analysis.  See Int'l Bhd. of Teamsters, 170 F.3d at 146 (describing the test for evident partiality as being "whether an objective, disinterested observer" would conclude that the arbitrator was biased (emphasis added)).  Such an approach might, moreover, have perverse effects because if it were the rule that vacatur would be warranted for an arbitrator's failure to live up to his or her own particularly punctilious standards of disclosure, arbitrators would have less of an incentive to set a high standard for their disclosures in the first place.

Secondly, we reject Scandinavian's assertion that the nondisclosure can only be explained by bias in favor of St. Paul. The record does not indicate why the information was not disclosed, but we do not find it implausible that Dassenko and Gentile labored under the false impression that they had made a disclosure which in fact they had failed to make, particularly in light of the fact that they did disclose (although not by name) the existence of the Scandinavian arbitration in the PMA proceeding.  St. Paul suggests that the nondisclosure may have occurred because of "sheer inadvertence, a mistaken belief that they had already disclosed it, or non-materiality."  Appellants' Reply Br. at 18.  Indeed, Peter Gentile seems to have operated under just such a false impression with respect to another matter

33

which he failed to disclose until late in the arbitration. In any event, the arbitrators' conduct is not such that a "reasonable person would have to conclude that an arbitrator was partial" to St. Paul. Morelite, 748 F.2d at 84 (emphasis added).

We also reject Scandinavian's argument that vacatur is required because the presentation of its arbitration case was disadvantaged by Dassenko's and Gentile's nondisclosure. See, e.g., Appellee's Br. at 44 ("If Scandinavian had known that Dassenko and Gentile had recently heard Hedges defend a contrary [position] in the other arbitration, it could have prepared for and presented Hedges' testimony in the [St. Paul] [A]rbitration differently, or not called him as a witness at all."); see also Scandinavian, 732 F. Supp. 2d at 308 & n.122 (concluding that the nondisclosure "deprived Scandinavian[] of an opportunity to . . . adjust [its] arbitration strategy," id. at 308). The FAA does not bestow on a party the right to receive information about every matter that it might consider important or useful in presenting its case. A party is not entitled to the "'complete and unexpurgated business biograph[ies]'" of the arbitrators whom the parties have selected. Applied Industrial, 492 F.3d at 139 (quoting Commonwealth Coatings, 393 U.S. at 151 (White, J., concurring)).

Finally, we are not persuaded that other reasons given by the district court for vacating the award require us to conclude that the arbitrators were "evident[ly] partial[]." The district court noted, Dassenko and Gentile "could [have]

34

receive[d] ex parte information" in the Platinum Arbitration about matters at issue in the St. Paul Arbitration, Scandinavian, 732 F. Supp. 2d at 308; and might have been influenced by the "credibility determinations" they made about Hedges, id.; and could have "influence[d] each other's thinking on issues relevant to the [St. Paul] Arbitration," id.  But these possibilities do not establish bias.  See Trustmark Ins. Co. v. John Hancock Life Ins. Co. (U.S.A.), 631 F.3d 869, 873 (7th Cir. 2011) (arbitrators not disqualified merely because they acquired relevant knowledge in a previous arbitration), cert. denied, 131 S. Ct. 2465 (2011); Int'l Bhd. of Teamsters, 170 F.3d at 147 (evident partiality "may not be based simply on speculation").  Neither do they distinguish this case from any number of others successfully presided over by arbitrators -- or by judges for that matter.

To be sure, in this case -- unlike in Applied Industrial -- Dassenko and Gentile plainly "had actual knowledge" of their concurrent service in the Platinum Arbitration. Scandinavian, 732 F. Supp. 2d at 309.  Although it would have been far better for them to have disclosed that fact, we do not think disclosure was required to avoid a vacatur of the Award in light of the fact that the relationship did not significantly tend to establish partiality.

We do not in any way wish to demean the importance of timely and full disclosure by arbitrators.  Disclosure not only enhances the actual and apparent fairness of the arbitral process, but it helps to ensure that that process will be final,

35

rather than extended by proceedings like this one.  We again reiterate Justice White's observation that it is far better for a potential conflict of interest "[to] be disclosed at the outset" than for it to "come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award."  Commonwealth Coatings, 393 U.S. at 151 (White, J., concurring); accord Applied Industrial, 492 F.3d at 139; Lucent Techs., 379 F.3d at 29; Andros Compania Maritima, 579 F.2d at 700.  But the better course is not necessarily the only permissible one.

Because we agree with St. Paul that the district court erred in vacating the Award in this case, we need not consider its alternative argument on appeal that the district court should not have vacated the arbitrators' interim rulings.

III.  Confirmation of the Award

Under section 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified or corrected 'as prescribed' in §§ 10 and 11."  Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 582 (2008).  And for petitions brought under the New York Convention, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207; see also Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 405 (2d Cir. 2009) (same, citing section 207).

Scandinavian has identified no basis other than the asserted evident partiality for vacating the Award under the FAA or New York Convention.  Because we conclude that evident partiality was absent, St. Paul's cross-petition to confirm the Award must be granted.

**CONCLUSION**

The judgment of the district court is reversed, and the case is remanded with instructions to the district court to deny Scandinavian's petition to vacate the Award, to grant St. Paul's cross-petition to confirm it, and to enter an amended judgment accordingly.

37