[59 NYS3d 672]

In the Matter of TCR SPORTS BROADCASTING HOLDING, LLP, Appellant-Respondent, v WN PARTNER, LLC, et al., Respondents, and WASHINGTON NATIONALS BASEBALL CLUB, LLC, et al., Respondents-Appellants.

In the Matter of TCR SPORTS BROADCASTING HOLDING, LLP, Respondent, v WN PARTNER, LLC, et al., Respondents, and WASHINGTON NATIONALS BASEBALL CLUB, LLC, Appellant.

First Department, July 13, 2017

**APPEARANCES OF COUNSEL**

*Chadbourne & Parke LLP*, New York City (*Thomas J. Hall* of counsel), and *Cooley LLP*, New York City (*Rachel W. Thorn, Alan Levine* and *Caroline Pignatelli* of counsel), for TCR Sports Broadcasting Holding, LLP, appellant-respondent/respondent.

*Sidley Austin LLP*, Washington, D.C. (*Carter G. Phillips* of the District of Columbia and Maryland bars, admitted pro hac vice, of counsel), for TCR Sports Broadcasting Holding, LLP, and others, appellants-respondents/respondents.

*Sidley Austin LLP*, New York City (*Benjamin R. Nagin, Eamon P. Joyce, Kwaku A. Akowuah* and *Tobias S. Loss-Eaton* of counsel), for the Baltimore Orioles Baseball Club and another, appellants-respondents/respondents.

*Rifkin Weiner Livingston LLC*, Baltimore, Maryland (*Aron U. Raskas* of the District of Columbia and Maryland bars, and *Arnold M. Weiner* of the Maryland bar, admitted pro hac vice, of counsel), and *Sidley Austin LLP*, New York City (*Charles S. Fax* of counsel), for Baltimore Orioles Limited Partnership, appellant-respondent/respondent.

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Stephen R. Neuwirth, Sanford I. Weisburst, Julia J. Peck* and *Cleland B. Welton II* of counsel), for Washington Nationals Baseball Club, LLC, respondent-appellant/respondent.

*Kirkland & Ellis LLP*, Washington, D.C. (*Paul Clement* of the District of Columbia bar, admitted pro hac vice, *Erin E. Murphy* of the District of Columbia and Virginia bars, admitted pro hac vice, and *Michael H. McGinley* of the District of Columbia bar, admitted pro hac vice, of counsel), *Williams & Connolly*, New York City (*John J. Buckley, Jr.* of counsel), and *Lupkin and Associates*, New York City (*Jonathan D. Lupkin* of counsel), for the Office of Commissioner of Baseball and another, respondents-appellants.

*Pillsbury Winthrop Shaw Pittman LLP*, New York City (*David G. Keyko* of counsel), for E. Leo Milonas, amicus curiae.

*Jenner Block LLP*, New York City (*Stephen L. Ascher, Irene M. Ten Cate* and *Jeremy H. Ershow* of counsel), for Diamond Dealers Club, Inc., amicus curiae.

*Moses & Singer LLP*, New York City (*Lawrence L. Ginsburg, Jay R. Fialkoff* and *Robert B. McFarlane* of counsel), for Kenneth R. Feinberg, amicus curiae.

*Friedman Kaplan Seiler and Adelman*, New York City (*Robert S. Smith, Robert J. Lack* and *Nora Bojar* of counsel), for Robert S. Smith, amicus curiae.

**OPINION OF THE COURT**

Per Curiam.

The order of the Supreme Court, New York County (Lawrence K. Marks, J.), entered on or about November 4, 2015, which, insofar as appealed from as limited by the briefs, denied respondent Washington Nationals Baseball Club, LLC's motion to confirm an arbitration award issued June 30, 2014 by Major League Baseball's Revenue Sharing Definitions Committee, granted the part of petitioner's motion seeking to vacate the

award, and denied the part of petitioner's motion seeking to direct that a second arbitration proceed before an impartial panel unaffiliated with Major League Baseball, should be affirmed, without costs. The order of the same court and Justice, entered July 11, 2016, which denied the Nationals' motion to compel the parties to re-arbitrate the claim before the Revenue Sharing Definitions Committee, and granted petitioner's cross motion to stay the parties from compelling or conducting another arbitration of this dispute until the final determination of the appeals from the November 4, 2015 order, should be modified, on the law, to grant the Nationals' motion, and otherwise affirmed, without costs.

ANDRIAS, J. (concurring). Pursuant to the negotiated terms of the parties' written agreement, the subject arbitration, governed by the Federal Arbitration Act (FAA) (9 USC § 1 *et seq.*), was initiated before the Revenue Sharing Definitions Committee (RSDC) of Major League Baseball (MLB), to resolve a contractual dispute over telecast rights fees between TCR Sports Broadcasting Holding, LLP, doing business as the Mid-Atlantic Sports Network (MASN) and the Baltimore Orioles, and the Washington Nationals. For the reasons stated herein, we find that the arbitration award issued by the RSDC on June 30, 2014 was correctly vacated based on "evident partiality" (9 USC § 10 [a] [2]) arising out of the Nationals' counsel's unrelated representations at various times of virtually every participant in the arbitration except for MASN and the Orioles, and the failure of MLB and the RSDC, despite repeated protests, to provide MASN and the Orioles with full disclosure or to remedy the conflict before the arbitration hearing was held. However, even if this Court has the inherent power to disqualify an arbitration forum in an exceptional case, on the record before us there is no basis, in law or in fact, to direct that the second arbitration be heard in a forum other than the industry-insider committee that the parties selected in their agreement to resolve this particular dispute, fully aware of the role MLB would play in the arbitration process.

Contrary to the view of the dissent, there has been no showing of bias or corruption on the part of the members of the reconstituted RSDC, and the Nationals will use new counsel at the second arbitration. Speculation that MLB will dictate the outcome of the second arbitration by exerting pressure on the new members of the RSDC does not suffice to establish that they will not exercise their independent judgment or carry out

their duties impartially, or that the proceedings will be fundamentally unfair.

In 2001, the Orioles and TCR Sports Broadcasting Holding, LLP (TCR) established the Orioles' Television Network as a platform to broadcast Orioles games in a seven-state television territory. In 2002, MLB purchased the failing Montreal Expos for $120 million. In 2004, MLB announced the relocation of the Expos to Washington, D.C. to become the Nationals. The Orioles objected to the move on the grounds that the introduction of the Nationals into its previously-exclusive markets would cause it significant economic harm.

In an effort to resolve several issues associated with the Expos' relocation, on March 28, 2005, MLB, TCR, the Nationals, and the Orioles entered into an agreement which provided, among other things, that TCR would be converted into a two-club regional sports network, MASN, which would have the sole and exclusive right to telecast, in the television territory, Nationals' and Orioles' games that were not otherwise retained or reserved by MLB's national rights agreements. The Orioles would be the managing partner and, initially, own 90% of MASN. The Nationals would own 10%, with its stake increasing, starting in 2010, by 1% per year, until it reached 33% in 2032. This allocation would allow the Orioles to receive reparative compensation through the distribution of profits in accordance with its then-applicable supermajority interests.

The agreement set the annual telecast fees to be paid to the teams between 2005 and 2011.[1] For 2005-2006, the Nationals would be paid $20 million per year. The Orioles would be paid up to $75,000 per game, with the final amount to be agreed upon between TCR and the Orioles. Beginning in 2007, the Orioles and the Nationals would each be paid $25 million per year, escalating at a noncompounded 4% rate.

The agreement also provided a methodology for determining future fees. "After 2011, and for each successive five year period, the Orioles, the Nationals and [MASN] [had to] first negotiate in good faith using the most recent information available which is capable of verification to establish the fair market value [FMV] of the telecast rights." If they were unable to agree on FMV during the mandatory negotiation period (30 days), they were to enter into nonbinding mediation under the

---

1. Because telecast rights fees are MASN's single largest expense, the amount of those fees directly affects MASN's profitability. Thus, any increase in telecast rights fees necessarily decreases the Orioles' compensation.

auspices of the American Arbitration Association (AAA) or JAMS. If negotiation and mediation failed, "then the fair market value of the Rights [would] be determined by [the RSDC] using the RSDC's established methodology for evaluating all other related party telecast agreements in the industry." The RSDC determination would be final and binding on the parties, who could seek to vacate or modify the FMV determination "only on the grounds of corruption, fraud or miscalculation of figures."

In anticipation of the negotiations for 2012-2016, MASN, with MLB's consent, retained the Bortz Media and Sports Group to calculate the fees pursuant to the "Bortz methodology," an accounting based profit margin analysis derived from a regional sports network's actual revenues and expenses. MASN maintains that the Bortz methodology is the "established methodology" adopted by the RSDC in at least 19 prior FMV determinations.

On January 4, 2012, MASN sent the Nationals a proposed rights fee schedule of $34 million per year. The Nationals, by their counsel, Proskauer Rose, LLP (Proskauer) rejected the proposal, valuing the Nationals' rights at more than $110 million per year based on a different methodology which analyzed fees obtained by MLB clubs in comparable markets.

In 2012, after negotiations failed and the parties waived mediation before the AAA or JAMS, the matter proceeded to arbitration before the RSDC, which was to be comprised of representatives from the Tampa Bay Rays, Pittsburgh Pirates, and New York Mets. In accordance with customary practice, the arbitration was administered by MLB staff, who also provided analytical and legal assistance to the RSDC.

The Nationals were represented by Proskauer. Because Proskauer served as MLB's longtime outside counsel, in January 2012, the Orioles' counsel sent separate emails to MLB's then-senior vice-president and general counsel and its then-executive vice-president, labor relations and human resources (Robert D. Manfred, Jr.), inquiring about Proskauer's representation of MLB and MLB clubs, including those with representatives on the RSDC. In reply, counsel was told that Proskauer had been MLB's principal labor counsel for years, represented MLB in the Los Angeles Dodgers bankruptcy matter and other matters, assisted in a small number of seminars/conference calls for club counsel about ADA and DOJ enforcement, and possibly did salary arbitration work for the Rays.

Counsel was advised to contact the clubs directly for further information concerning their relationships with Proskauer.

In a January 27, 2012 letter, the Orioles' counsel advised Proskauer that the arbitration

> "cannot be insulated from your firm's deeply ingrained, concurrent representations of [MLB], and various [MLB] clubs ('Clubs') including one, if not more of the Clubs appointed by the Commissioner to serve on the RSDC as to the present rights fee dispute. As you know, the RSDC functions under the direct control of MLB and the Office of the Commissioner, and as your correspondence confirms, your firm has 'performed certain work for the Office of the Commissioner . . . .'"

In a separate letter dated that same day, TCR's counsel advised Proskauer that he too had "serious concerns" about the firm's role in the arbitration, including its

> "longstanding representation of MLB itself, MLB's Labor Relations Committee (which is tightly lined with the RSDC), and at least one of the three Clubs that are voting members of the RSDC. We do not believe it is appropriate for a firm that represents the decision-maker in the instant dispute also to represent a litigant before that decision maker."

On February 2, 2012, the Nationals, the Orioles, and MASN met with Manfred and MLB staff for a prehearing organizational meeting. Counsel for MASN and the Orioles provided Manfred with a letter dated February 1, 2012 which reiterated that Proskauer's substantial past and current representation of the Orioles, which Proskauer unilaterally terminated, and of MLB and various MLB clubs, "including at least one of the Clubs appointed by the Commissioner to serve on the RSDC," tainted the proceedings. Particularly, the letter stated that

> "Proskauer's longstanding representations of litigant, ultimate decision-maker and participating RSDC member Club(s) raise, at a minimum, serious questions of partiality, prejudice, and misuse of confidential and proprietary information, which in view of well-established fair hearing and due process protections, compromise this proceeding and the rights and privileges to which the parties are entitled. Moreover, as a practical matter and, at

the very least, the appearance of a conflict of interest on the part of Proskauer cannot be avoided and will thus diminish the credibility of the RSDC proceeding and undermine principles of fairness and impartiality.

"The full scope of Proskauer's representations of MLB, including the Labor Relations Committee and other matters, and MLB Clubs, including at least the one Club participating on the RSDC, is not fully known at present to TCR or the Orioles and may, in fact, extend even further. Under the circumstances, therefore, and in view of recognized principles of fairness and due process, the Orioles and TCR respectfully request that the RSDC preclude Proskauer from participating in this proceeding. Anything less would he procedurally and substantively inappropriate and compromise the integrity of this appeal. We submit that this issue should be addressed prior to the RSDC addressing any substantive matters."

Because MLB had yet to reveal the identities of the individuals representing the clubs that would be on the RSDC, and had instructed the parties not to communicate with the arbitrators directly, MASN and the Orioles asked Manfred to transmit the February 1, 2017 letter to the arbitrators (who were shown as "cc, Members Revenue Sharing Definition Committee"), and inform them of their objections to Proskauer's participation in the arbitration.[2] When MASN and the Orioles asked that Proskauer be disqualified from representing the Nationals, Manfred replied that the RSDC lacked the legal authority to disqualify counsel. Counsel for MASN then asked Manfred for a continuing objection as to Proskauer's participation in the arbitration, which Manfred granted.

In March 2012, in their submissions statements to the RSDC, MASN and the Orioles expressly reserved their objections arising out of Proskauer's conflicts and participation in the proceedings on behalf of the Nationals. Pursuant to protocol, these submission statements, as well as the Orioles' reply, which reiterated the continuing objection to Proskauer's involvement, were sent to Manfred for distribution to the RSDC members.

On April 3, 2012, the RSDC, composed of the president of the Pittsburgh Pirates, the principal owner of the Tampa Bay Rays

---

2. Only during the vacatur proceeding did MASN and the Orioles learn that MLB claimed that it never did so.

and the chief operating officer of the New York Mets, held a one-day hearing. The Nationals asserted that their rights had an FMV averaging $118 million per year for 2012-2016, based on an analysis of factors including the size and attractiveness of the Nationals' television market, a survey of the economic value of recent deals entered into by teams in other comparable markets, and the escalating value of live sports programming. MASN asserted that the Nationals should be paid an average $39.5 million per year based on the Bortz methodology, including an assumption that MASN should be guaranteed a 20% profit margin on baseball programming. During the arbitration, MASN and the Orioles repeated their objections to Proskauer's representation of the Nationals numerous times.

In the summer of 2012, the approximate amounts of the rights fees determined by the RSDC were announced to the parties. However, the release of a final decision was deferred while then Commissioner Bud Selig attempted to negotiate a broader settlement.

During the course of these negotiations, MASN paid the Nationals for their telecast rights in the amounts that it had proposed to the RSDC. When the Nationals made clear that they viewed the resolution of their 2012-2013 compensation as a "condition precedent" to any broader settlement, MLB, to keep the negotiations going, advanced $25 million to the Nationals to reduce the shortfall between RSDC's unreleased award and the amounts that MASN was paying for those two years. MLB documented this payment, which was made more than a year after the RSDC had informed the parties what its decision would be, in a letter agreement with the Nationals stating that "if the RSDC issues a decision that covers 2012 and/or 2013, any payments from MASN otherwise due to the Nationals will be made first to [MLB] to cover" the $25 million, plus interest. The agreement provided in the alternative that MLB could recover the $25 million if MASN was sold to a third party.

On June 30, 2014, the RSDC issued its final written decision in which it determined that the Nationals' rights fees for 2012 would be roughly $53 million, and would rise by approximately $3 million per year through 2016. The RSDC rejected MASN's and the Orioles' argument that their interpretation of the Bortz methodology was the "RSDC's established methodology," stating that Bortz "does not estimate the fair market value of a Club's broadcasting rights by reviewing the network's revenue

and expenses and nothing more," but includes "additional information relevant to the Committee's deliberations, including, for example, comparisons of the Club's local rights fees with verified fees of Clubs in comparable Major League markets." The RSDC also rejected the Nationals' position that the RSDC's " 'established methodology' consists primarily of an analysis of rights fees obtained by Clubs in comparable markets." Instead, the RSDC stated that its "established methodology includes an analysis of the income statement of the network, a review of broadcast agreements in comparable markets to verify the financial statement analysis, and a consideration of any additional factors raised by the parties that may impact the analysis."

Although MLB cautioned all parties that they should not challenge the award in court, and threatened them with the strongest sanctions available under MLB's constitution if they did so, in September 2014, MASN (on behalf of itself and the Orioles) commenced this proceeding seeking to vacate the arbitration award on the ground it was procured through bias, evident partiality, misconduct, fraud, corruption, and undue means, and was rendered beyond the scope of the arbitrators' authority and in manifest disregard of the law. MASN also sought to have the matter remanded for a second arbitration before a different forum. The Nationals cross-moved to confirm the RSDC's award.

In support of its petition, MASN alleged that MLB had a financial stake in the outcome of the arbitration due to the $25 million advance it made to the Nationals; that MLB, the Nationals and the arbitrators all used the same law firm without full disclosure as to possible conflicts; that MLB controlled the arbitration process; and that the arbitrators failed to apply the Bortz methodology, as required by the agreement. MASN further alleged that the RSDC was impossibly tainted by a conflict of interest because an increase in the rights fees, which are taxed by MLB, meant that more money would go into MLB's revenue sharing pool, and the Rays and Pirates, whose representatives were on the RSDC, were teams that benefited from revenue-sharing.

By order dated November 4, 2015, the court denied the Nationals' motion to confirm and granted the part of MASN's motion seeking to vacate the RSDC's award. The sole basis for this determination was the court's finding that "evident partiality" had resulted from the Nationals' representation by

Proskauer. The court rejected MASN's and the Orioles' other challenges to the award, finding that there was no fraud or prejudicial misconduct, that there was no proof that RSDC had been improperly influenced by MLB's purported financial stake in the award, and that the RSDC's award was "reasonable on its face" and did not exceed the RSDC's powers or constitute manifest disregard of the law.

In reaching its finding of evident partiality, the court stated that the arbitration proceedings had been rendered fundamentally unfair by (i) Proskauer's representation of "MLB, its executives and closely related entities in nearly 30 other matters" and "interests associated with all three arbitrators," and (ii) MLB, the arbitrators, the Nationals and/or Proskauer's failure to take reasonable steps to address MASN's and the Orioles' concerns over Proskauer's involvement. The court rejected the Nationals and MLB's argument that such conflicts were to be expected because MASN and the Orioles agreed to an "inside baseball" arbitration, stating that MASN and the Orioles had not agreed to "a situation in which MASN's arbitration opponent, the Nationals, was represented in arbitration by the same law firm that was concurrently representing MLB and one or more of the arbitrators and/or the arbitrators' clubs in other matters."

The court denied the part of petitioner's motion seeking to direct that a second arbitration proceed before an impartial panel unaffiliated with MLB, stating that "re-writing the parties' Agreement is outside of [the court's] authority."

MASN appealed on the issue of whether the court properly rejected its argument that a new arbitration should be before a different forum. The Nationals filed a cross appeal challenging the determination of evident partiality. Before the appeals were heard, the Nationals moved for an order compelling MASN and the Orioles to submit to a new RSDC arbitration. MASN opposed and cross-moved pursuant to CPLR 2201 for a stay of proceedings pending determination of the appeals.

The court denied the Nationals' motion to compel a new arbitration before the RSDC. Pursuant to CPLR 2201, the court stayed the parties "from compelling or conducting another arbitration of this dispute, without the agreement of all the parties to this proceeding, until the final determination of the appeals."

■ To vacate an award because of evident partiality under the FAA (9 USC § 10 [a] [2]), the movant bears the burden of

showing that a reasonable person, considering all the circumstances, would have to conclude that an arbitrator was partial to one party to the arbitration (*see Kolel Beth Yechiel Mechil of Tartikov, Inc. v YLL Irrevocable Trust*, 729 F3d 99, 104 [2d Cir 2013]; *U.S. Elecs., Inc. v Sirius Satellite Radio, Inc.*, 17 NY3d 912 [2011] [adopting the Second Circuit's "reasonable person standard"]). Although this requires "something more than the mere appearance of bias" (*see Morelite Constr. Corp. [Div. of Morelite Elec. Serv., Inc.] v New York City Dist. Council Carpenters Benefit Funds*, 748 F2d 79, 83 [2d Cir 1984] [internal quotation marks omitted]), "[p]roof of actual bias is not required" (*Scandinavian Reins. Co. Ltd. v Saint Paul Fire & Mar. Ins. Co.*, 668 F3d 60, 72 [2d Cir 2012]). Rather, a finding of partiality can be inferred "from objective facts inconsistent with impartiality" (*Kolel Beth Yechiel Mechil*, 729 F3d at 104 [internal quotation marks omitted]).

"Among the circumstances under which the evident-partiality standard is likely to be met are those in which an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties" (*Scandinavian Reins. Co. Ltd.*, 668 F3d at 72). Factors to be considered include

> "(1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding" (*Yosemite Ins. Co. v Nationwide Mut. Ins. Co.*, 2016 WL 6684246, *7, 2016 US Dist LEXIS 157061, *19-20 [SD NY Nov. 10, 2016, 16 Civ 5290 (PAE)] [internal quotation marks omitted]).

"While the presence of actual knowledge of a conflict can be dispositive of the evident partiality test, the absence of actual knowledge is not" (*Applied Indus. Materials Corp. v Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F3d 132, 138 [2d Cir 2007]).

The record shows that Proskauer, while representing the Nationals in the arbitration, had an extensive relationship with the clubs that comprised the RSDC and/or their representatives, and with MLB, which administered the proceeding. Discovery in the vacatur proceeding revealed that

i. the Proskauer attorneys representing the Nationals represented the Pirates in *Senne v Office of the Commr. of Baseball*,

No. 14-00608 (ND Cal) and *Garber v Office of the Commr. of Baseball*, No. 12-03704 (SD NY). Proskauer had also represented the Pirates president, who was its representative on the RSDC, in *Phillips, et al. v Selig*, No. 1966 EDA 2007 (Pa Super Ct), and advised the Pirates on Americans with Disability Act matters.

ii. Proskauer represented the Rays in *Senne* and four separate salary arbitrations, one of which occurred during the arbitration; and

iii. Proskauer defended the father of Jeffery Wilpon, the Mets chief operating officer and its representative on the RSDC, and the father's company, in a class action arising out of the Madoff Ponzi scheme, which was ongoing during the arbitration. Proskauer also represented the Mets in *Senne*.

Proskauer also concurrently represented MLB, its executives and closely-related entities in approximately 50 engagements. Although MASN and the Orioles repeatedly protested Proskauer's involvement and requested complete disclosure so they could assess the extent of the potential conflicts, MLB and the arbitrators undisputedly failed to provide full disclosure or seek to conduct the proceeding with arbitrators who had no prior relationships with Proskauer. While the arbitrators aver in this proceeding that they have no recollection of MASN's and the Orioles' disclosure requests or objections, the record establishes conclusively that MASN and the Orioles reiterated their objections in their written submissions to the RSDC before the merits hearing was held and at the hearing itself.

The evidence that the same lawyers in the same firm were representing interests of the arbitrators and MLB at the same time as they represented the Nationals in the arbitration is an objective fact inconsistent with impartiality. The arbitrators had a duty to, but did not, investigate or disclose their relationships with Proskauer, and MLB failed to exercise what power it had to ensure confidence in the fairness of the proceedings in light of MASN's stated concerns (*see Applied Indus. Materials Corp.*, 492 F3d at 137 [where "(a)n arbitrator . . . knows of a material relationship with a party" but fails to disclose it, "(a) reasonable person would have to conclude that (the) arbitrator who failed to disclose under such circumstances was partial to one side," even where the award itself was not clearly favorable to the other party]; *Morelite*, 748 F2d at 84 [vacating award based on "a father-son relationship between an arbitrator and the President of an international labor union," without

any suggestion that the father was sitting in some representative capacity]).

MASN did not waive its evident partiality challenge by failing to move for the disqualification of the arbitrators. MASN demonstrated its belief that it was improper for Proskauer to represent the Nationals given its role as MLB's outside counsel, its representation of MLB clubs, including one club that had a representative of the RSDC panel, and MLB's role in administering the proceeding and appointing the RSDC arbitrators, who might also have relationships with Proskauer. Particularly, in a February 13, 2012 email, Manfred stated that the Orioles' and MASN's objections should be separately documented to him. On February 14, 2012, counsel for the Orioles and MASN complied, asking Manfred whether anything more was needed. On February 16, 2012, counsel for the Orioles again wrote to Manfred, stating,

> "To reiterate, what we agreed to when we met in New York on February 4, 2012 [sic], and what has been consistently stated in our discussions and all correspondence is that since the RSDC would not—or believed it did not have the authority to— preclude Proskauer as we had requested, the RSDC would grant, and in fact, granted the Orioles and TCR [MASN] a continuing objection to Proskauer's representation of the Nationals and that all of the Orioles' and TCR's [MASN's] objections, reservations, rights, privileges, claims and actions related to Proskauer's participation in these proceedings would be preserved for all purposes, without any waiver of any kind, including by virtue of the Orioles' and TCR's [MASN's] continued participation in this RSDC proceeding."

In their March 12 submission statements to the RSDC, counsel for MASN and the Orioles expressly stated that they reserved and preserved all rights, claims, causes of action and privileges, waiving none, arising from or related to Proskauer's participation in the proceedings on behalf of the Nationals. In a September 2, 2013 email, Manfred advised the Orioles' counsel that "[w]e would never assert that you have waived your objection to Proskauer's involvement."

■ Accordingly, the trial court was correct in vacating the RSDC's determination based on "evident partiality." However, even if the dissent is correct that it must be within the inher-

ent equitable power of the court to protect fundamental fairness by sending the arbitration to a new forum, we conclude, on the record before us, that the court correctly rejected MASN's and the Oriole's argument that the parties' agreement should be disregarded and the matter remanded to an arbitral forum unaffiliated with MLB.[3]

The FAA "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms" (*Volt Information Sciences, Inc. v Board of Trustees of Leland Stanford Junior Univ.*, 489 US 468, 478 [1989]). "Where, as here, the parties have agreed explicitly to settle their disputes only before particular arbitration fora, that agreement controls" (*Merrill Lynch, Pierce, Fenner & Smith, Inc. v Georgiadis*, 903 F2d 109, 113 [2d Cir 1990]).

The dissent nevertheless states that, under the "rare circumstances" presented, MASN's and the Orioles' expectations of a reasonably fair and impartial arbitration forum in the RSDC have been frustrated, and that the arbitration clause selecting the RSDC as the arbitral forum should be reformed to require a rehearing before a new forum. In delineating these rare circumstances, the dissent asserts that MLB and the Commissioner effectively control the RSDC, appointing its members and participating in the evidentiary and decision-making process, and that they have endorsed the original award in public

---

**3.** Citing *Rabinowitz v Olewski* (100 AD2d 539, 540 [2d Dept 1984]), the dissent finds that courts, in an appropriate case, have inherent power to disqualify an arbitral forum before an award has been rendered. However, *Rabinowitz* did not involve the FAA and the Second Circuit and other federal courts have held that although the FAA provides for vacatur where there was "evident partiality or corruption in the arbitrators, it does not provide for pre-award removal of an arbitrator" (*Aviall, Inc. v Ryder Sys., Inc.*, 110 F3d 892, 895 [2d Cir 1997] [internal quotation marks and citation omitted]; *PK Time Group, LLC v Robert*, 2013 WL 3833084, *2-4, 2013 US Dist LEXIS 104449, *5-11 [SD NY July 23, 2013, No. 12 Civ 8200 (PAC)]; *see also Gulf Guar. Life Ins. Co. v Connecticut Gen. Life Ins. Co.*, 304 F3d 476, 490 [5th Cir 2002]). The concurrence, citing *Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith* (85 NY2d 173, 181-182 [1995]) and *Matter of Cullman Ventures (Conk)* (252 AD2d 222, 228 [1st Dept 1998]), would also hold that "[t]his Court may not order that the arbitration take place in a forum other than the one selected by the parties, notwithstanding the possibility of a more impartial proceeding in another forum." However, we need not, and, contrary to the dissent's characterization, indeed do not, determine whether, in an exceptional case, *Rabinowitz* should apply to cases governed by the FAA. As discussed infra, even if such inherent power exists, MASN and the Orioles have not established that remand to the RSDC will be fundamentally unfair under the particular circumstances before us. Thus, we leave the issue for another day, if it arises in an appropriate case.

comments and filings in this case that prejudge and predetermine the outcome of a future arbitration before the RSDC. The dissent also finds that the RSDC would be conflicted in a second arbitration because the only way MLB can now recover its $25 million advance is if the RSDC rejects the lower amount of telecast rights fees put forth by MASN and the Orioles, and awards the Nationals significantly higher amounts. Thus, the dissent posits that a rehearing by the same arbitral forum would be all but guaranteed to yield the same result, even though the panel has changed.

However, the circumstances cited by the dissent do not warrant the removal of the RSDC. While the dissent waxes poetic about the purity of the game of baseball, MLB is first and foremost a business, governed by its constitution and innumerable agreements and contracts. Because arbitration is a matter of contract, "the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen" (*National Football League Mgt. Council v National Football League Players Assn.*, 820 F3d 527, 548 [2d Cir 2016]) and the FAA permits parties to select arguably partial arbitrators, if doing so serves their interests (*see Sphere Drake Ins. Ltd. v All Am. Life Ins. Co.*, 307 F3d 617 [7th Cir 2002], *cert denied* 538 US 961 [2003]). In *Sphere Drake*, the Seventh Circuit explained:

> "Parties are free to choose for themselves to what lengths they will go in quest of impartiality. Section 10 (a) (2) just states the presumptive rule, subject to variation by mutual consent. Industry arbitration, the modern law merchant, often uses panels composed of industry insiders, the better to understand the trade's norms of doing business and the consequences of proposed lines of decision. The more experience the panel has, and the smaller the number of repeat players, the more likely it is that the panel will contain some actual or potential friends, counselors, or business rivals of the parties. Yet all participants may think the expertise-impartiality tradeoff worthwhile; the Arbitration Act does not fasten on every industry the model of the disinterested generalist judge. To the extent that an agreement entitles parties to select interested (even beholden) arbitrators, § 10 (a) (2) has no role to play" (307 F3d at 620 [citations omitted]; *see also Yonkers Contr. Co. v Port Auth. Trans-*

*Hudson Corp.*, 87 NY2d 927, 929 [1996] ["As a general proposition, parties to an arbitration contract are completely free to agree upon the identity of the arbitrators, and New York courts have therefore regularly refused to disqualify arbitrators on grounds of conflict of interest or partiality even in cases where the contract expressly designate(s) a single arbitrator . . . employed by one of the parties" (internal quotation marks and emphasis omitted)]).

Here, MASN, the Orioles and the Nationals expressly chose to carve out disputes over telecast fees for arbitration before the RSDC, an industry-insider committee with specialized knowledge on the complex issue of how to calculate the appropriate fees that television networks should pay to teams for broadcast rights. In contrast, their agreement specified that other disputes would be arbitrated before the Commissioner or the AAA, evidencing that the decision to carve out telecast fee disputes for arbitration before the RSDC was a conscious choice.

In making that choice, as the dissent acknowledges, the sophisticated parties, represented by experienced counsel, knew full well how the RSDC operated, including that MLB would have significant influence over the arbitration process. MASN and the Orioles knew that RSDC's members are selected by MLB in its sole discretion, that there are no written rules of evidence, discovery rights or obligations, sworn testimony, or direct or cross-examination of witnesses. Most significantly, they knew that MLB staff would provide administrative, organizational and legal support, including analyzing financial information and preparing draft decisions in accordance with the instructions of the RSDC members who would make the final determinations. Indeed, while objecting to Proskauer's involvement, MASN's counsel acknowledged during proceedings before the motion court that MASN "bought into whatever the structure was, whatever [MLB]'s role was; we agreed to that, we had to live with that."

Furthermore, in 2004, the Orioles had used the RSDC to determine the FMV of the telecast rights fees the Orioles were receiving from their then regional sports network. In 2006, Orioles owner Peter G. Angelos testified before Congress as to the advantages of using the RSDC as a neutral body to determine the FMV of the future rights fees under the agreement, stating:

"Last year, we paid the Nationals $20 million to televise their games, which is more than Comcast SportsNet paid us to televise Orioles games. The agreement provides a mechanism to revalue the rights fees at a market-based rate through an MLB committee in the event TCR/MASN and the Nationals are not able to agree on a new contract. The benefits of that arrangement to both the Nationals and Orioles cannot be overstated. It guarantees each team a market rate as evaluated and set by a neutral third party determined by [MLB]."

MASN and the Orioles also waived the opportunity to mediate this dispute before the AAA or JAMS, electing to proceed directly to arbitration before the RSDC, as the preferred entity to resolve the dispute. The only reason that their position has changed is that they are unhappy with the RSDC's refusal to accept their interpretation of the Bortz methodology as RSDC's established methodology, which led to an award that exceeded their expectations.

Insofar as the dissent finds that MLB demonstrated a lack of concern for the fairness of the first proceeding by taking no action in response to petitioner's objections to the participation of Proskauer as counsel for the Nationals, this defect has been remedied. Proskauer is no longer representing the Nationals and the composition of the RSDC has changed, with the appointment of three new arbitrators affiliated with different clubs.

The dissent's position that the new panel will remain puppets of MLB, rather than exercise its independent judgment, is pure conjecture. An attack on the impartiality of the arbitrators "must be based on something overt, some misconduct on the part of an arbitrator[s], and not simply on [their] interest in the subject matter of the controversy or [their] relationship to the party who selected [them]" (*Matter of Astoria Med. Group [Health Ins. Plan of Greater N.Y.]*, 11 NY2d 128, 137 [1962]). Indeed, if the dissent's position is adopted, and the RSDC is disqualified based on the mere possibility that MLB will unduly influence it, it would eliminate the viability of any future arbitration by any MLB club before the RSDC, and place into question the viability of industry-insider arbitrations in general.

The dissent finds that MLB has a direct financial stake in the amount of the fees that will be awarded in the second

arbitration because MLB will only recoup its $25 million advance if the Nationals are awarded more than the amount MASN and the Orioles have proposed. However, the Nationals have offered to post a bond to guarantee repayment of the advance to MLB regardless of the outcome of the arbitration. While the dissent states in conclusory fashion that the posting of a bond will not resolve the issue, and should not be considered because it was raised at oral argument, it does not persuasively explain why that is so, and ignores the circumstances that led to the advance and its purpose, turning the parties' intent behind the advance on its head.

After the arbitrators made their draft decision known, the issuance of a final decision was deferred in the hope of reaching a global settlement among the parties. While negotiations continued and settlement proposals were exchanged, MASN continued to pay the Nationals the $39.5 million per year it maintained was due, notwithstanding its awareness that the RSDC would award over $50 million. The Nationals were not content with this continuing shortfall and MLB made the $25 million advance to keep the club at the negotiating table, which benefited both parties by allowing the Nationals to receive the proposed award at no financial cost to MASN and the Orioles, thereby forestalling litigation to enforce the RSDC award. To allow the Orioles to now use the advance, which maintained the status quo, as a sword to disqualify the RSDC defies logic and mischaracterizes MLB's efforts to have the parties negotiate their differences without undue financial pressure on either side. Furthermore, given the fact that MASN has paid the Nationals over $30 million per year for the last five years for their telecast rights, it is speculative at best to conclude that the Nationals do not have the ability to repay the advance if the result of the second arbitration changes to its detriment.

Nor does the fact that MLB has made certain public statements expressing the view that the RSDC acted within the scope of its authority in setting the rights fees, and that MASN would have to abide by that determination "sooner or later," warrant the transfer to a new forum. Again, it is the RSDC, not MLB or its Commissioner, that will render a final decision in this matter. Indeed, while the dissent casts MLB's Commissioner as a "de facto fourth arbitrator," it concedes that he does not have a vote. As to the dissent's reliance on evidence that MLB has actively opposed MASN's claims by threatening sanctions for pursuing a judicial remedy, those warnings were ad-

dressed to all parties. In taking this position, MLB was merely attempting to protect the binding arbitration process that the parties had previously agreed to and MLB's constitution.

In an attempt to bring the forum dispute within the purview of the FAA, the dissent also finds that the initial decision reflects that the RSDC has been shown to be "so corrupt or biased" as to undermine the expectations of the parties to have a fundamentally fair hearing. However, when viewed in the context of the RSDC's actual award, the dissent's position is without foundation. In fact, the RSDC rejected both sides' arguments as to the methodology that should be used to determine FMV and the award of $53 million per year was far closer to the $39.5 million proposed by MASN and the Orioles than the $118 million demanded by the Nationals. There has been no showing that the RSDC was either corrupt or biased.

Even if the second arbitration was referred to the AAA, as proposed by the dissent, any panel selected would necessarily be comprised of arbitrators with expertise in professional sports and broadcast fees. Thus, given the small pool of qualified arbitrators available, there would be no assurance that all potential conflicts or bias would be removed or that MASN and the Orioles would be satisfied with the RSDC's successor and "would not bring yet another proceeding to disqualify him or her" (*Marc Rich & Co., A. G. v Transmarine Seaways Corp. of Monrovia*, 443 F Supp 386, 388 [SD NY 1978]).

The dissent's reliance on *Aviall, Inc. v Ryder Sys., Inc.* (110 F3d 892 [2d Cir 1997], *supra*), and *Erving v Virginia Squires Basketball Club* (349 F Supp 716 [ED NY 1972], *affd* 468 F2d 1064 [2d Cir 1972]) as a basis for reforming the arbitration clause is misplaced.

In *Aviall*, the agreement required that the disputes only be submitted to the designated arbitrator if it were an "independent auditor" of both parties (*Aviall* at 894). The plaintiff sought removal of the arbitrator due to a "business relationship" with a party (*id.* at 893). While stating that in certain limited circumstances a court has the power to remove an arbitrator pursuant to section 2 of the FAA if the arbitration agreement itself "is subject to attack under general contract principles" (*Aviall* at 895), the Second Circuit affirmed the district court's decision not to adjudicate the dispute over which arbitrator would hear the matter. The court reasoned that the dispute over whether the auditor arbitrator was sufficiently "independent" to satisfy the terms of the arbitration agreement

did not constitute a claim "invalidating the contract" or a claim of some type of fraud in the inducement that would invalidate the agreement under general contract principles (*id.* at 895-897). This reasoning is equally applicable to this case.

In *Erving*, the Second Circuit affirmed the district court's decision to substitute a neutral arbitrator in place of the Commissioner of the American Basketball Association based on an impermissible conflict of interest, that is, that the Commissioner was a partner at the law firm representing the defendant. Here, the dissent's criticism is directed at MLB, not the arbitrators.

Even if a challenge to the panel's independence was an equitable ground for reformation, we are not asked to replace arbitrators who have shown themselves to be less than impartial. Indeed, the new arbitrators on the reconstituted RSDC have not demonstrated any bias in the matter and there has been no showing of an impermissible conflict between them and MASN or the Orioles. Thus, MASN and the Orioles have not made the extraordinary showing of grounds needed to reform the agreement or disqualify the RSDC, without which we lack the authority to reform the contract.

In sum, it cannot be said that MASN's and the Orioles' expectation of a reasonably fair and impartial arbitration forum in the RSDC has been frustrated, and there is no basis to sever the clause in the parties' agreement selecting the RSDC as the arbitral forum for this dispute or to reform the clause to require a rehearing before a new forum unconnected to MLB.

The motion court's decision vacating the award was based solely on Proskauer's conflicts, a defect that has been remedied in that the Nationals have retained new counsel. MASN and the Orioles have not and cannot show that the agreement is unenforceable under general contract principles. Everyone was aware that the RSDC was composed of MLB owners, or their designees, and of the inherent conflicts the panel's relationship with MLB created. MASN and the Orioles have not established that MLB, whose staff are required to treat each club "fairly and equitably," would wield any improper or unforeseen power over a newly constituted RSDC arbitration panel. Nor has it been shown that the new RSDC members (the principal owner of the Milwaukee Brewers and executives of the Toronto Blue Jays and Seattle Mariners) have any bias against MASN or the Orioles.

Under these circumstances, to compel the parties to arbitrate before a body other than one to which they knowingly agreed, just because MASN and the Orioles are dissatisfied with the result, would violate the Nationals' right to assert their contractual rights under the agreement and create undue uncertainty within this industry, and others, that have chosen to use panels composed of industry insiders, with specialized expertise, to arbitrate complex disputes.

KAHN, J. (concurring). I agree that Supreme Court correctly vacated the award based on evident partiality. I also concur in the result reached by the plurality that the arbitration may not be referred to another forum, but I do so on different grounds.

This arbitration is governed by the Federal Arbitration Act (FAA) (9 USC § 1 *et seq.*), and the substantial body of case law under the FAA holding that negotiated arbitration agreements must be judicially enforced according to their terms (*Volt Information Sciences, Inc. v Board of Trustees of Leland Stanford Junior Univ.*, 489 US 468, 476 [1989]), in the absence of an established ground for setting such agreements aside, such as fraud, duress, coercion or unconscionability (*Matter of Cullman Ventures [Conk]*, 252 AD2d 222, 228 [1st Dept 1998], citing *Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, 85 NY2d 173, 181-182 [1995]). The duty of courts in promoting the goal of the FAA is to " 'rigorously enforce' arbitration agreements according to their terms" (*Salvano* at 181), even when they appear to be unwise.

Here, the conduct of Major League Baseball and its representatives has been far from neutral and balanced. But this was the forum the parties chose, even avoiding the opportunity for a hearing before a panel of the American Arbitration Association and proceeding directly to the Revenue Sharing Definitions Committee (RSDC). New arbitrators have been designated to hear the matter for the RSDC. This Court may not order that the arbitration take place in a forum other than the one selected by the parties, notwithstanding the possibility of a more impartial proceeding in another forum (*Salvano* at 181-182; *Cullman Ventures*, 252 AD2d at 228 ["Nor may courts direct that the arbitration take place in a forum other than that specified in the agreement, notwithstanding a possibly fairer or more convenient proceeding in a forum not designated in the agreement"]).

Acosta, P.J. (dissenting in part). Part of what makes baseball such a beloved sport is its rules, which preserve the integrity and popularity of the game (*see* Office of the Commissioner of Baseball, Official Baseball Rules [2016], available at http:// mlb.com/mlb/downloads/y2016/official_baseball_rules.pdf [accessed June 29, 2017]). Players take the field with the expectation that the umpires are not predisposed to apply those rules in favor of one team over the other. The players win or lose each game based on their own skills and the fair application of the rules—not the influence of some outside force, such as partial umpires or illegal betting. In short, the game is fundamentally fair, a concept that is equally important in arbitrations. An arbitration, like most sports, requires that adversaries begin on a level playing field, with ground rules that are applied fairly to both sides, and without decision-makers who will prejudge the matter. Otherwise, there would be no integrity or trust in the process. Unfortunately, in this case, we are confronted with a fundamentally unfair arbitration that was conducted by Major League Baseball and involved a dispute between two baseball clubs.

I cannot recall having previously encountered such a confluence of factors that call for judicial intervention in an arbitration: Not only does the entity administering the arbitration (Major League Baseball [MLB]) have significant influence over the arbitrators, including the power to marshal evidence and draft arbitral award decisions, but it also made a bet on the outcome of the arbitration by loaning one of the parties $25 million to be repaid after an award in that party's favor.[1] And, more egregiously still, the Commissioner of Baseball who controls the arbitration process made public statements during post-award litigation indicating a position on the merits of the case. Under these unique circumstances, a rehearing by the same arbitral forum that conducted the initial arbitration

---

**1.** Coincidentally, in recent decision issued by the MLB Commissioner's office, the Commissioner noted that the

"severe rule [that led to a player's permanent ban from the sport for betting] is a reflection of the fact that gambling by players and managers on games involving their Clubs has the potential to undermine the integrity of the game on the field and public confidence in the game" (Office of the Commissioner, Major League Baseball, *Decision of Commissioner Robert D. Manfred, Jr., Concerning the Application of Rose for Removal from the Permanently Ineligible List* at 2 [Dec. 14, 2015], available at http://mlb.com/documents/8/4/6/159619846/Commissioner_s_Decision_on_Pete_Rose_Reinstatement_u35dqem0.pdf [accessed June 29, 2017] [hereinafter MLB Rose Decision]).

under the purview of the Commissioner's office would be all but guaranteed to yield the same result. Therefore, to effectuate the intent of the parties as expressed by their contractual choice to arbitrate the dispute before a panel of experts, I would hold that it is necessary and appropriate to exercise our inherent equitable power to reform the contract and refer the matter to a neutral arbitral forum, one that is possessed of expertise relevant to the specific issues involved, to conduct a fundamentally fair arbitration.

Justice Andrias's concurring opinion (the plurality) appears to acknowledge that this Court may have the power to refer the matter to a neutral arbitral forum other than that chosen by the parties under the appropriate circumstances, but chooses not to exercise that power here. This invites the question: If courts do have the power to reform an arbitration clause to provide fundamental fairness in an arbitration, where, if not here, would the exercise of such power be proper? While I agree that the arbitral award was properly vacated due to evident partiality—where it was not fully disclosed that the law firm representing one of the parties also represented the entity conducting the arbitration and the interests of all three arbitrators in unrelated matters, and the arbitral forum refused to take any steps to correct this obvious unfairness—I dissent because this particularly egregious set of circumstances warrants the referral of the case to a neutral arbitral forum. Thus, I would instead hold that courts can and should refer the matter to an alternative forum in the rare circumstances presented here.

To the extent that Justice Kahn's concurrence (the concurrence) suggests that this Court lacks the power to substitute an arbitral forum even in the most compelling circumstances, that argument is belied by the case law indicating that fundamental fairness is a requirement in any arbitration. And it fails to convincingly explain why this Court should abdicate its inherent equitable power to dispense justice in every case that comes before it (*see* NY Const, art VI, § 7 [a]; *People v Correa*, 15 NY3d 213, 227-228 [2010]). The concurrence would render this Court impotent to do anything other than vacate an arbitral award and remand it to the same forum for a subsequent arbitration—resulting in an endless loop of partial arbitrations, vacaturs, and remands—even where the parties' chosen forum has shown itself to be unwilling to guarantee a baseline of impartiality. To adopt that position would be a

mistake. In the same way that the Commissioner of Baseball has a duty to protect "the integrity of play on the field through appropriate enforcement of the Major League Rules" (MLB Rose Decision at 2), so too does this Court have the obligation, and the power, to ensure fundamental procedural fairness in an arbitration that is brought before it for review.

I. Background

Major League Baseball (MLB) purchased the Montreal Expos baseball franchise in 2002 and, in 2004, renamed the team "the Nationals" and relocated it to Washington, D.C. The Baltimore Orioles Baseball Club (the Orioles) objected to the relocation, as it had been the only MLB club in the Baltimore/ D.C. area since 1972 and had developed TCR Sports Broadcasting Holding (TCR), a regional sports network that gave the team the exclusive right to telecast baseball games in most of a seven-state television territory. The Orioles were concerned that the Nationals would dilute the market, cause fan attrition, and diminish the value of the Orioles' telecast rights and other investments in the region.

In March 2005, after the Orioles and TCR threatened to take legal action, MLB, TCR, the Nationals, and the Orioles entered into an agreement to resolve the dispute. The agreement provided for annual compensation to the Orioles and TCR for the significant economic harms caused by the Nationals' relocation. As relevant here, the agreement converted TCR into a two-club regional sports network named the Mid-Atlantic Sports Network (MASN), which was to be owned in supermajority by the Orioles and in minority by the Nationals and was given the exclusive right to present the games of both teams. The Orioles were initially given a 90% ownership stake in MASN, which would decrease by 1% per year from 2010 to 2032, at which point the Orioles would have a final stake of 67%. The Orioles would receive ongoing payments from MASN's profits in proportion to their supermajority interest (i.e., for each dollar of profit, the Orioles would receive a percentage equal to their ownership stake at the time of profit distribution).

Because the telecast rights fees paid to the teams are MASN's single largest expense, the amount of the fees directly impacts MASN's profitability. Thus, any increase in telecast rights fees necessarily decreases the Orioles' compensation. The parties negotiated the specific fees to be paid annually by MASN to the teams between 2005 and 2011, as well as a

methodology for determining future fees. With regard to future fees, the agreement provided that, for each five-year period after 2011, "the Orioles, the Nationals and [MASN] first shall negotiate in good faith using the most recent information available which is capable of verification to establish the fair market value of the telecast rights."

The agreement included a dispute resolution clause to be used in the event that the three entities (the Orioles, the Nationals, and MASN) could not reach an agreement on a fair market value of the rights. That clause provided that, if there was no resolution after a mandatory negotiation period, the entities would enter a nonbinding mediation "under the auspices of the American Arbitration Association or JAMS." If that failed, the entities would then submit the dispute to arbitration before the MLB's Revenue Sharing Definitions Committee[2] (RSDC), which would make a binding determination as to the fair market value of the parties' rights using "the RSDC's established methodology for evaluating all other related party telecast agreements in the industry."

In 2011, in advance of negotiations with the Nationals regarding the fair market value for the telecast rights fees for the 2012-2016 period, MASN devised a fee schedule based upon what it believed to be the "RSDC's established methodology"—an accounting-based profit margin analysis derived from a regional sports network's actual revenues and expenses that was developed by Bortz Media and Sports Group, Inc. (Bortz). With MLB's consent, MASN retained Bortz to determine the fees pursuant to the Bortz methodology, and on January 4, 2012, MASN sent the Nationals a proposed fee schedule of $34 million per year for the period of 2012-2016. The Nationals rejected that valuation, instead valuing its rights at more than $110 million per year according to a different methodology, which was based on factors including the size and attractiveness of the Nationals' television market, a survey of the economic value of recent deals entered into by teams in other comparable markets, and the escalating value of live sports programming.

---

2. The RSDC is a standing committee of MLB consisting of three representatives from MLB clubs appointed by the Commissioner of Baseball. The RSDC's principal role is to analyze transactions between clubs and other parties that involve baseball-related revenue (including telecast agreements with regional sports networks) to ensure that the revenue clubs receive under those transactions faithfully represents fair market value for revenue-sharing purposes.

The parties failed to resolve their dispute through negotiation, waived the agreement's mediation requirement, and submitted the dispute to the RSDC.[3] The RSDC conducted an arbitration administered by MLB staff, including Robert D. Manfred, Jr., then an executive vice-president of MLB and currently the Commissioner of Baseball. MLB and Manfred's staff provided significant support to the RSDC, including legal analysis, participation in the decision-making process, and the drafting of an arbitral award.

At the RSDC arbitration, the Nationals were represented by Proskauer Rose LLP (Proskauer), a law firm that also served as MLB's longtime outside counsel. MASN and the Orioles objected to Proskauer's representation of the Nationals and sought complete disclosure of MLB's and the individual arbitrators' relationships with the firm. MLB provided only limited disclosures, which did not reveal the full extent of Proskauer's representations of MLB and the arbitrators' clubs and interests. In February 2012, Manfred held an organizational meeting to discuss the procedures for the arbitration before the RSDC; the arbitrators were not present at that meeting. MASN and the Orioles persisted in their objection—which they repeated at least 18 times throughout the arbitration—but Manfred stated that he did not believe MLB had the authority to disqualify Proskauer. In addition, counsel for MASN and the Orioles sent Manfred a letter dated February 1, 2012, explaining that Proskauer's past representation of the Orioles—which Proskauer had unilaterally terminated—and the firm's representation of MLB and various MLB clubs, "including at least one of the Clubs appointed by the Commissioner to serve on the RSDC," tainted the proceedings. Counsel for MASN and the Orioles asked Manfred to transmit the letter to the individual arbitrators (whose identities had yet to be revealed) and to inform them of the objections to Proskauer's participation in the arbitration.[4]

In discovery before the motion court, it was revealed that Proskauer represented MLB, its executives, and closely related entities in nearly 50 separate engagements and that the firm

---

**3.** As constituted at that time, the RSDC was comprised of Stuart Sternberg, principal owner of the Tampa Bay Rays; Francis Coonelly, president of the Pittsburgh Pirates; and Jeffrey Wilpon, chief operating officer of the New York Mets.

**4.** It was not until the instant action that MASN and the Orioles learned that MLB claimed that it never transmitted the letter to the arbitrators.

also represented interests associated with all three arbitrators. Many of those representations were concurrent with the RSDC arbitration yet were not disclosed to the Orioles or MASN at the time. In the order appealed from, the motion court noted that there were nearly 30 engagements between MLB and Proskauer during the 2½ years that the arbitration was pending.

The RSDC held a one-day hearing on the merits in April 2012. According to a sworn affidavit of MASN's outside counsel who was present at the hearing, Manfred sat at the head table with the arbitrators and asked questions of counsel. That summer, MLB's staff prepared a draft decision for the RSDC and all parties were advised of the approximate amounts of the telecast rights fees under it. Release of the RSDC's final decision was deferred until June 2014 while then-Commissioner Allan H. (Bud) Selig attempted to negotiate a resolution of the dispute. In the interim, MASN paid the Nationals the Bortz-calculated fees, which were significantly lower than the estimated fees as set forth in the draft decision.

In August 2013, while negotiations were ongoing, MLB paid a $25 million advance to the Nationals in anticipation of the Nationals being awarded the same amount in the RSDC's final determination as in the draft decision. Pursuant to an agreement between MLB and the Nationals, the Nationals would only be required to repay MLB if MASN were sold or if the RSDC awarded fees to the Nationals for the years 2012 and 2013 at the amount set forth in the draft decision. MASN and the Orioles were aware of the advance but were not apprised of all of the repayment terms between MLB and the Nationals, and claim that they were told at the time that MLB was lending the Nationals only $7.5 million.

On June 30, 2014, the RSDC issued its final decision in writing. With respect to the methodology of fair market valuation, the RSDC explained that the parties' agreement requires the MLB to apply the RSDC's "established methodology" (not the so-called Bortz methodology advocated by MASN and the Orioles). The RSDC also rejected the Nationals' argument that the " 'established methodology' consists primarily of an analysis of rights fees obtained by Clubs in comparable markets." Instead, the RSDC explained, its "established methodology includes an analysis of the income statement of the network, a review of broadcast agreements in comparable markets to verify the financial statement analysis, and a consideration of

any additional factors raised by the parties that may impact the analysis." Applying this methodology to the parties' dispute, the RSDC valued the Nationals' telecast rights fees from MASN at roughly $53 million in 2012, with the fees rising more than $3 million each year thereafter, culminating in fees of approximately $66 million in 2016. It appears based on emails in the record on appeal that the RSDC's written determination was essentially similar to the draft decision.

In a letter dated June 30, 2014, the same day as the RSDC award, then-Commissioner Selig expressed his disappointment to the principal owners of the Orioles and the Nationals that the two clubs were unable to negotiate a settlement. In addition, Selig advised the parties that they were not authorized to commence litigation seeking judicial review of the award, and issued the following threat: "[I]f any party [i.e. the Orioles, the Nationals, or MASN] initiates any lawsuit, or fails to act in strict compliance with the procedures set forth in the Agreement concerning the RSDC's decision, I will not hesitate to impose the strongest sanctions available to me under the Major League Constitution."

Despite that threat, MASN commenced this special proceeding in July 2014 (on behalf of itself and the Orioles) to vacate the RSDC arbitration award, arguing, inter alia, that it was procured through evident partiality. Specifically, the petition noted the following as evidence of partiality: (1) the Nationals' choice to be represented in the arbitration by Proskauer; (2) MLB's $25 million loan to the Nationals; (3) MLB's significant role in the arbitration process; and (4) the inadequacy of disclosures made by the arbitrators and/or MLB as to possible conflicts.[5]

In October 2014, the Nationals submitted a verified answer to the petition and a cross motion to confirm the arbitration award and dismiss the petition. MLB also submitted an answer asking the court to deny the petition and grant the Nationals' cross motion to confirm the RSDC's decision.

During the pendency of this action, now-Commissioner Manfred was quoted in the press as saying, "I think the

---

**5.** After MASN commenced the instant action, MLB continued to threaten sanctions, leading MASN to seek and obtain from the motion court a temporary restraining order and preliminary injunction against MLB and Nationals to prevent enforcement of the arbitral award until judicial review was completed.

In filings and arguments in the instant action, MLB and its officials have continued to defend the RSDC award and to seek to have it confirmed.

agreement's clear . . . . I think the RSDC was empowered to set rights fees. That's what they did, and I think sooner or later MASN is going to be required to pay those fees" (Associated Press, *Manfred: MASN Eventually Must Pay Nats Increased Rights Fees*, USA Today [May 21, 2015], available at https://www.usatoday.com/story/sports/mlb/2015/05/22/manfred-masn-eventually-must-pay-nats-increased-rights-fees/27735977/ [accessed June 29, 2017]). In addition, Manfred submitted an affirmation in the present litigation in which he states that he advised the Orioles' attorney that the Orioles' interpretation of the parties' agreement

> "did not conform to the text. . . . The relevant contract provision makes no reference to any 'Bortz Methodology,' and certainly includes no reference to MASN maintaining a 20 percent operating margin, which is what MASN and the Orioles now claim the Bortz Methodology requires. . . . [I]f MASN maintaining a mandatory 20 percent operating margin had been intended by the parties, it would have been very easy to write those words into the contract."

In an order entered on or about November 4, 2015 (the November 2015 order), Supreme Court denied the Nationals' motion to confirm the RSDC decision, and granted MASN's petition to the extent of vacating the RSDC award due to evident partiality. Specifically, the court found evident partiality based on Proskauer's representation of the Nationals in the RSDC arbitration "while concurrently representing MLB, its executives and closely related entities in nearly 30 other matters" and "concurrently representing interests associated with all three arbitrators during [the relevant] period" (from January 5, 2012 to June 30, 2014). The court determined that the objective facts were "unquestionably inconsistent with impartiality," and that MLB's "complete inaction" in addressing MASN's concerns about Proskauer's conflicts "demonstrates an utter lack of concern for fairness of the proceeding that is 'so inconsistent with basic principles of justice' that the award must be vacated" (quoting *Pitta v Hotel Assn. of N.Y. City, Inc.*, 806 F2d 419, 423 [2d Cir 1986]). However, the court, reasoning that it lacked the authority to rewrite the parties' agreement, rejected the Orioles' argument that the matter should not be remanded to the RSDC and should instead be referred to a body of neutral arbitrators not subject to MLB's influence.

The Nationals subsequently advised the other parties that they would forgo representation by Proskauer, and moved for an order compelling MASN to comply with the November 2015 order by arbitrating before the RSDC. MASN opposed the motion and cross-moved for a stay of further arbitral proceedings pending resolution of the appeal of the prior order. In an order entered July 11, 2016 (the July 2016 order), Supreme Court denied the motion to compel arbitration before the RSDC and granted the cross motion to stay arbitration pending resolution of the appeal of the November 2015 order.

MASN and the Orioles appeal from the November 2015 order to the extent that the court declined to direct that a second arbitration proceed before a different arbitral forum, and the Nationals and MLB cross-appeal from that order to the extent that it vacated the award and denied the motion to confirm the arbitration award. The Nationals also appeal from the July 2016 order.

II. Discussion

Under section 10 (b) of the Federal Arbitration Act (FAA), if an arbitral award is vacated, "the court may, in its discretion, direct a rehearing by the arbitrators" (9 USC § 10 [b]). Moreover, while the FAA generally upholds arbitration agreements as "valid, irrevocable, and enforceable," such agreements may be vitiated "upon such grounds as exist at law or in equity for the revocation of any contract" (9 USC § 2). "Although not made explicit in the statute, courts have discretion to remand a matter to the same arbitration panel or a new one" (*Sawtelle v Waddell & Reed*, 304 AD2d 103, 117 [1st Dept 2003]). This is a logical extension of courts' "broad discretion in fashioning appropriate relief" (*Aircraft Braking Sys. Corp. v Local 856, Intl. Union, United Auto., Aerospace & Agric. Implement Workers, UAW*, 97 F3d 155, 162 [6th Cir 1996] [discussing powers of federal district courts], *cert denied* 520 US 1143 [1997]; *see also* NY Const, art VI, § 7 [New York "supreme court shall have general original jurisdiction in law and equity and the appellate jurisdiction herein provided"]; *Correa*, 15 NY3d at 227-228). The inherent discretion of the courts to fashion the appropriate remedy is necessary to ensure, among other things, that arbitrations are conducted in a fundamentally fair manner.

Fundamental fairness is indeed a foundational precept of any arbitration (*see e.g. Bowles Fin. Group, Inc. v Stifel, Nicolaus & Co., Inc.*, 22 F3d 1010, 1012 [10th Cir 1994] ["Courts

have created a basic requirement that an arbitrator must grant the parties a fundamentally fair hearing"]; *Bell Aerospace Co. Div. of Textron, Inc. v Local 516, Intl. Union, United Auto., Aerospace & Agric. Implement Workers of Am. [UAW]*, 500 F2d 921, 923 [2d Cir 1974] ["(A)n arbitrator need not follow all the niceties observed by the federal courts. He (or she) need only grant the parties a fundamentally fair hearing"]). What is meant by fundamental fairness is that the parties can reasonably expect that the arbitrators will approach the dispute without bias, that the arbitrators will view evidence without prejudgment as to the merits, and that the dispute is not predetermined as it enters arbitration (*see Bowles Fin. Group*, 22 F3d at 1013 ["(C)ourts seem to agree that a fundamentally fair hearing requires only notice, opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decisionmakers (sic) are not infected with bias"]; *see also Matter of Astoria Med. Group [Health Ins. Plan of Greater N.Y.]*, 11 NY2d 128, 137 [1962] [applying state law and noting that even "partisan" arbitrators in tripartite arbitration, where two party-selected arbitrators select a "neutral" third, may not "be deaf to the testimony or blind to the evidence presented. Partisan (they) may be, but not dishonest"]). Indeed, as the United States Supreme Court has held, the "provisions [of section 10 of the FAA] show a desire of Congress to provide not merely for any arbitration but for an impartial one" (*Commonwealth Coatings Corp. v Continental Casualty Co.*, 393 US 145, 147 [1968]). In *Commonwealth Coatings Corp.*, the Court also rejected the argument that Congress intended "to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another" (393 US at 150).

The Nationals' argument that fundamental fairness is not required in arbitration—and the concurrence's implication that the courts have no role to play in protecting fundamental fairness in arbitrations—is perplexing, as an arbitration conducted by partial or conflicted arbitrators who are permitted to prejudge a case would be nothing more than a farce. Likewise, it would be farcical to permit an arbitration to proceed in an arbitral forum whose administrator has signaled an intent to do everything in his or her power to compel a particular result. And yet, the concurrence apparently takes the position that, no matter how egregious the case, the courts are powerless to re-

fer an arbitration to a forum other than the one selected in the parties' contract. This view, taken to its logical conclusion, would lead to an absurd result: an endless cycle of partial arbitrations, vacaturs, and remands. While the plurality leaves open the question of whether this Court has the authority to refer the matter to a neutral forum, the concurrence's categorical position would strip this Court of its inherent discretion to fashion an appropriate remedy and would undermine the role of courts in protecting at least an elemental degree of fairness in the adjudicative process of arbitration. Therefore, it must be within the inherent equitable power of the courts to protect fundamental fairness in any arbitration that is submitted for their review.

What, then, may a court do when presented with an arbitration that was (or a subsequent arbitration that would almost certainly be) devoid of fundamental fairness? There is no real dispute that courts are empowered to substitute a contractually chosen arbitrator where there is evidence of a conflict or bias (*see* 4 Thomas H. Oehmke, Commercial Arbitration § 131:17; *Erving v Virginia Squires Basketball Club*, 468 F2d 1064, 1067 n 2 [2d Cir 1972] [affirming district court's substitution of a neutral arbitrator for parties' chosen arbitrator "to insure a fair and impartial hearing," where the chosen arbitrator had become a partner of the law firm representing one of the parties]). Where the parties differ is on the question of whether courts have the discretion to direct a rehearing before an entirely different arbitral forum, where it is shown that a fundamentally fair hearing cannot be had in the parties' chosen forum.

Although the Nationals, MLB, and the concurrence argue that courts have no such discretion, they fail to cite any authority that specifically prohibits courts from fashioning a remedy that includes ordering an arbitration in a different forum under the appropriate circumstances. There also does not appear to be any clear authority that under the FAA a court can direct a new arbitration to be administered by an arbitral organization different from the one agreed to by the parties; yet, the statute does permit courts to reform an arbitration agreement on legal or equitable grounds (9 USC § 2; *see also Aviall, Inc. v Ryder Sys., Inc.*, 110 F3d 892, 896 [2d Cir 1997], discussing reformation of contract in *Erving v Virginia Squires Basketball Club*, 349 F Supp 716 [ED NY 1972], *affd* 468 F2d 1064 [2d Cir 1972], *supra*). Moreover, such a result has been approved under New

York law (*see Rabinowitz v Olewski*, 100 AD2d 539 [2d Dept 1984]). In *Rabinowitz*, the Second Department, applying state law, affirmed the trial court's removal of an arbitration from the forum that the parties had selected, because "the appearance of bias . . . permeate[d] the entire [arbitral forum] including the board of arbitrators from which the arbitrators for th[e] dispute were selected" (*id.* at 540). Because "the FAA was modeled after New York's arbitration law" as codified in the CPLR, and "no significant distinction can be drawn between the policies supporting the FAA and the arbitration provisions of the CPLR" (*Matter of Smith Barney, Harris Upham & Co. v Luckie*, 85 NY2d 193, 205-206 [1995]), it is appropriate to apply the reasoning of *Rabinowitz* here.

Thus, while the parties' contractual choice to select a particular arbitral forum is entitled to great deference, courts nevertheless retain their inherent judicial power, and their statutory power under 9 USC § 2, to override that choice in the event that the forum is shown to be so corrupt or biased as to undermine the reasonable expectations of the parties to have a fundamentally fair hearing.

The plurality appears to view as unequivocal the quote excerpted from a Second Circuit decision that the FAA "does not provide for pre-award removal of an arbitrator" (quoting *Aviall*, 110 F3d at 895). However, the plurality takes this quote out of context by omitting the very next sentence of that court's opinion, which explained that "an agreement to arbitrate before a particular arbitrator may not be disturbed, *unless the agreement is subject to attack under general contract principles* 'as exist at law or in equity' " (*id.*, quoting 9 USC § 2 [emphasis added]). Indeed, the court in *Aviall* noted the plaintiff's citation to "cases in which an arbitrator was removed prior to arbitration on account of a relationship with one party to the dispute," cases that "manifest the FAA's directive that an agreement to arbitrate shall not be enforced when it would be invalid under general contract principles" (*id.* at 895-896). In one of those cases, *Erving*, the Second Circuit affirmed the district court's reformation of an arbitration agreement where the parties' chosen arbitrator had become a partner at the law firm representing one of the parties (*see Erving*, 468 F2d at 1064). This shows that courts applying the FAA have the power in egregious cases to remove an arbitrator or reform an arbitration agreement, even pre-award, where an arbitration clause is invalid under general contract principles (*cf. Matter of Astoria*

*Med. Group [Health Ins. Plan of Greater N.Y.]*, 11 NY2d at 132 [holding under state law that, "in an appropriate case, the courts have inherent power to disqualify an arbitrator before an award has been rendered"]). This is one of those cases.

Here, notwithstanding the contractual provision naming the RSDC as the arbitral forum, the circumstances call for an equitable remedy providing that the second arbitration take place in a forum unaffiliated with MLB or the RSDC. MASN and the Orioles persuasively argue that they would be unable to obtain a fundamentally fair arbitration if the RSDC were to rehear the matter. This argument is supported by amici curiae Robert S. Smith and Kenneth R. Feinberg and the following facts: MLB's apparent lack of concern for fairness at the first proceeding; MLB's refusal to address the Orioles' complaints of the unfairness created by Proskauer's multiple roles; MLB's direct monetary stake in the outcome of the dispute as a result of its $25 million loan to the Nationals; evidence that MLB has actively opposed MASN's claims by threatening sanctions for pursuing a judicial remedy, disparaging the claims, and making clear its view that MASN's reading of the agreement is incorrect; evidence that MLB has actively supported the Nationals' attempts to confirm the award and/or compel a rehearing before the RSDC; MLB's continued defense of the original arbitration award which all members of this bench agree was affected by evident partiality; and evidence of the current Commissioner's personal involvement in the prior arbitration, including the drafting of the vacated award, and his publicly stated views about the dispute.

To be sure, MASN and the Orioles were aware at the time of entering into the contract that MLB would have significant influence over the arbitration process at the RSDC, as is consistent with MLB's standard practice in RSDC proceedings (MLB typically provides administrative support, legal analysis, and drafting assistance). But, over the course of those proceedings and in the instant litigation, it has become clear that their choice of the RSDC as a fundamentally fair forum comprised of industry-insider arbitrators has been frustrated. Thus, contrary to the plurality, while they "knew full well how the RSDC operated, including that MLB would have significant influence over the arbitration process," they did not know at the time of contracting how far MLB would go to obtain the outcome it wanted. For example, MLB failed to protect the parties' confidence in the fairness of the proceeding when it refused to

adequately address the objections to Proskauer's participation. While the removal of Proskauer from further involvement resolves the inherent conflicts resulting from the firm's participation, contrary to the plurality, the firm's removal does not negate the finding that MLB conducted itself poorly in failing to intercede, nor does it guarantee that MLB will prioritize fundamental fairness in a subsequent arbitration. In fact, MLB does not yet acknowledge that there was anything wrong with its conduct during the original arbitration. Thus, MLB's lack of concern for fairness at the first proceeding supports a remedy directing a rehearing before a different arbitral body unattached to MLB. Moreover, in light of MLB's refusal to acknowledge its wrongful conduct that led to the now-vacated arbitral award, the plurality fails to answer this critical question: If the decision-maker cannot see the flaws in its decision-making process, why should it be trusted to go through the process again?

MLB's $25 million loan to the Nationals during the first arbitration also suggests that a second arbitration at the RSDC would be bereft of fundamental fairness. At the time it made the loan, MLB bore little risk that it would not be repaid, because it made the loan only after the arbitrators had issued the draft decision, which covered that amount. Now that the Court is affirming the vacatur of the first award, however, MLB's actual financial interest in the outcome of the second arbitration is quite significant. Since MASN has already paid the Nationals the full amount of telecast rights fees as calculated under the Bortz methodology, the Orioles' and MASN's position in a second arbitration will likely be that an appropriate award would be zero. Thus, the only way MLB can now recover the loan amount is through an award in excess of the Bortz-calculated fees. In other words, if MASN's calculations are adopted (and the Nationals' and MLB's calculations rejected) at the second hearing, MLB will not be repaid. As MLB's counsel acknowledged in proceedings before the motion court, "[I]f the award had changed [from the amount set forth in the draft decision], . . . Major League Baseball would have been out the money." It is surprising to me that the plurality fails to appreciate the incentive this provides to MLB to do whatever it can to steer a second arbitration in its (and the Nationals') favor.

Moreover, as amicus curiae Robert S. Smith points out, the motion court described the support role of MLB's Commissioner's Office in the first arbitration as "generally akin to the

support that a law clerk provides to a judge." Notwithstanding that MLB's role in the arbitration went far beyond the role of a law clerk, Mr. Smith writes that "[t]his case may thus be viewed as presenting the question: When is it acceptable for the arbitral counterpart of a judge's law clerk to have a significant financial stake in the outcome of an arbitration? We respectfully submit that the answer should be 'Never.' " I agree.[6] Just as betting is an affront to the integrity of baseball (*see* MLB Rose Decision at 2), staking money on a result in an arbitration under one's own control is anathema to the nature of arbitration as an adjudicative process and to the ability of courts to do justice by the parties.

The fact that the RSDC is comprised of three new members does not change the analysis, because MLB retains its significant influence over the panel. Indeed, the Commissioner sat with the RSDC arbitrators and asked questions during the hearing at the first arbitration, acting as a de facto fourth arbitrator. Although he did not provide a fourth vote, his influence on the panel, including his ability to marshal and exclude evidence and draft an award, remains substantial. Given the Commissioner's public comments touching upon the merits of the dispute and telegraphing his support for the Nationals' position, it is highly unlikely that the RSDC would come to a different conclusion if it were to rehear the case. While it is true that the parties chose the RSDC with the understanding that MLB would have significant influence over the arbitration process, they did not consent to MLB dictating the result. The plurality misses the point when it states that the three new

---

**6.** We should not countenance the Nationals' proposal to post a bond to guarantee repayment of the $25 million advance to MLB, as it was not raised in the briefs and, instead, was raised for the first time at oral argument before this Court. Thus, the argument that this proposal should assuage the Court's concerns regarding fundamental fairness in a subsequent arbitration before the RSDC is unpreserved (*see Matter of Erdey v City of New York*, 129 AD3d 546, 547 [1st Dept 2015]; *OFSI Fund II, LLC v Canadian Imperial Bank of Commerce*, 82 AD3d 537, 538 [1st Dept 2011], *lv denied* 17 NY3d 702 [2011]).

In any event, contrary to the plurality, the Nationals' proposal to post a bond does not sufficiently eliminate the potential of unfairness if the arbitration were to return to the RSDC. The issue of fundamental fairness involves due process concerns, and MLB's loan to the Nationals is but one indicium of bias. Posting a bond to ensure that the loan would be repaid to MLB regardless of who wins the subsequent arbitration would not overcome the other procedural infirmities described herein. In other words, the Nationals cannot buy their way out by offering to post bond for the amount of the advance to be repaid to MLB.

RSDC arbitrators have not shown any bias. While that may be true, the salient point is that MLB still controls nearly every facet of the RSDC and has shown itself—through its past conduct and the Commissioner's statements—to be incapable of protecting fundamental fairness in administering an arbitration of the instant dispute. Here, as in *Rabinowitz*, the arbitral forum initially selected by the parties is tainted by "the appearance of bias," which "permeates the entire [arbitral forum]" (100 AD2d at 540).

Therefore, I would hold that the matter cannot be reheard by the RSDC and should be referred to a neutral arbitral body, namely the American Arbitration Association (AAA). This is the proper result in the circumstances of this case. The AAA is the logical choice given that section 8.C of the parties' agreement selected the AAA as a catchall to arbitrate disputes that were not specifically covered by other clauses in the contract.[7] Although, in section 2.J of the agreement, the parties specifically selected the RSDC for disputes over telecast rights fees, the RSDC is no longer an appropriate forum for this particular dispute. Accordingly, applying the catchall provision's selection of the AAA to conduct the arbitration is the best method to effectuate the intent of the parties while protecting fundamental procedural fairness. To the extent that the parties intended to select arbitrators who have some level of expertise relevant to the dispute—a concern also voiced by amicus curiae E. Leo Milonas—section 8.C satisfies that prerequisite: it states that the three-person panel of the AAA "shall be constituted of persons with specialized knowledge, experience or expertise in broadcasting, media rights, or professional sports." Surely the AAA, a nationally renowned arbitration organization, has on its roster several arbitrators with the desired expertise or its equivalent; the parties would not have selected the AAA to arbitrate section 8.C disputes if that forum lacked such arbitrators.

The plurality is simply wrong in its assertion that "there is no basis, in law or in fact," to order a rehearing in a different

---

7. Section 8.C of the agreement states that those disputes "shall be arbitrated before a three-person panel in accordance with the Commercial Rules of the American Arbitration Association," and rule R-2 of those rules states that "[w]hen parties agree to arbitrate under these rules . . . they thereby authorize the AAA to administer the arbitration" (American Arbitration Association Commercial Arbitration Rules and Mediation Procedures § R-2, available at https://www.adr.org/sites/default/files/Commercial%20Rules.pdf [accessed June 30, 2017]).

arbitral forum from the one originally selected by the parties. As discussed above, courts are empowered to do so through their inherent discretion and the reformation power embodied in section 2 of the FAA. Even the plurality, while arguing that there is no legal basis for referring the matter to a new arbitral forum, agrees that the agreement could be reformed if only MASN and the Orioles had "made the extraordinary showing of grounds needed to reform the agreement or disqualify the RSDC."[8] In my view, they have made such a showing here.[9]

The cases relied on by the plurality are distinguishable. For example, the plurality quotes the Second Circuit in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v Georgiadis*, which stated that where "parties have agreed explicitly to settle their disputes only before particular arbitration fora, that agreement controls" (903 F2d 109, 113 [2d Cir 1990]). The difference between that case and this one is obvious from the word "fora," the plural form of the term "forum" (Merriam-Webster Online Dictionary, fora [https://www.merriam-webster.com/dictionary/fora] [accessed June 30, 2017]). In other words, the agreement in *Georgiadis* allowed the plaintiff to "select one of several arbitration fora in which to arbitrate" (903 F2d at 110-111)— and none of those were shown to be biased—whereas the agreement in the instant matter named a single arbitral *forum* (the RSDC) that has shown itself to be incapable of observing fundamental fairness in arbitrating this particular dispute. Moreover, the plurality quotes *Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, in which the Court of Appeals noted that "courts have refused . . . to direct that the parties arbitrate in a forum other than that specified in their agree-

---

**8.** Ironically, the plurality's eloquent description of the defects in the original arbitration convincingly shows that it was affected by an extraordinary degree of bias.

**9.** Surprisingly, the plurality speculates that the "only reason" MASN and the Orioles challenged the RSDC award is that "they are unhappy with the RSDC's refusal to accept their interpretation of the Bortz methodology as RSDC's established methodology." That view does not comport with the plurality's position that the first arbitration was properly vacated due to evident partiality. The Orioles may very well be unhappy with the amount of the arbitral award, but they likewise are legitimately unhappy with the defective manner in which the arbitration was conducted.

Furthermore, the plurality's suggestion that the arbitration amount was fair because the dollar amount of the award was closer to the Orioles' calculations than to the Nationals' does not show that the arbitration process was fair, that it was free of undue influence by MLB, or that a second arbitration would be fair. The amount of the award may simply reflect that the Nationals' proposed valuation was outlandish (an issue I do not decide).

ment, even though permitting the choice of a different forum might seem fairer or more suited to the needs of a particular party" (85 NY2d 173, 181-182 [1995]). That courts have refused to do so, however, does not mean that courts are without the power to do so where fundamental fairness cannot be obtained in the parties' chosen forum. Here, a different forum not only "seems fairer," but the parties' chosen forum is decidedly unfair under the circumstances. And, critically, none of the cases cited by the plurality (and the concurrence) holds that courts lack the power to order an arbitration in a new forum where the parties' only selected forum is too biased to fairly arbitrate the dispute.[10]

Moreover, notwithstanding the plurality's statement that "the FAA permits parties to select arguably partial arbitrators, if doing so serves their interests," MASN and the Orioles did not agree to an arbitration before a panel that would prejudge the case in their adversary's favor. Nor is it likely that such a concession would comport with fundamental fairness. Of course, the parties may select arbitrators who have specific expertise relevant to the dispute and who may therefore be somewhat non-neutral, but there is no authority that supports the proposition that parties may select an arbitral panel that is predisposed to ruling in favor of one party regardless of the evidence presented to it. To the contrary, "simply because arbitrators can be non-neutral does not mean that such arbitrators are excused from their ethical duties and the obligation to participate in the arbitration process in a fair, honest and good-

---

**10.** Neither *Salvano* nor *Matter of Cullman Ventures (Conk)* (252 AD2d 222 [1st Dept 1998]) confronted the issue of pervasive bias and fundamental fairness in an arbitration. *Salvano* held that the trial court lacked "the authority to order the parties to proceed [with an expedited arbitration pursuant to CPLR article 75] absent any provision explicitly authorizing expedited arbitration in the parties' agreements" (85 NY2d at 178). *Cullman Ventures* held that the trial court improperly enjoined an arbitration in another state and consolidated it with an arbitration in New York (252 AD2d at 228 ["By conflating two different arbitrations, arising under separate and distinct agreements, involving different parties, the court improperly intruded into what clearly were binding contractual arrangements"]).

Thus, to the extent that those decisions touch upon the issue raised in this case—by suggesting that courts may not "direct that the arbitration take place in a forum other than that specified in the agreement, notwithstanding a possibly fairer . . . proceeding in a forum not designated in the agreement" (*id.*; *see also Salvano*, 85 NY2d at 182)—they did so only in dicta and without the threat of a forum that had revealed its unwillingness to provide the parties with a fundamentally fair arbitration.

faith manner" (*Matter of Excelsior 57th Corp. [Kern]*, 218 AD2d 528, 531 [1st Dept 1995] [internal quotation marks omitted]).

The plurality's reliance on *National Football League Mgt. Council v National Football League Players Assn.* (820 F3d 527 [2d Cir 2016]) is also inapposite. That case involved a labor arbitration (not a commercial arbitration, as here) in which the court specified that "[t]he basic principle driving both our analysis and our conclusion is well established: a federal court's review of labor arbitration awards is narrowly circumscribed and highly deferential—indeed, among the most deferential in the law" (*id.* at 532). That level of deference does not apply here. Moreover, although "the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen" (*id.* at 548), an arbitral award may still be set aside even "[w]here the parties have expressly agreed to select partial party arbitrators" and "the objecting party proves that the arbitrator's partiality prejudicially affected the award" (*Winfrey v Simmons Foods, Inc.*, 495 F3d 549, 551 [8th Cir 2007] [internal quotation marks omitted], cited by *National Football League Mgt. Council* at 548).

Even the plurality's lengthy quote from *Sphere Drake Ins. Ltd. v All Am. Life Ins. Co.* does not support the proposition that party-appointed arbitrators may completely prejudge a case (307 F3d 617, 620 [7th Cir 2002], *cert denied* 538 US 961 [2003] [noting that the arbitrators under arbitration rules in that case could "engage in *ex parte* discussions with their principals until the case is taken under advisement, but they are supposed thereafter to be impartial adjudicators"]). Furthermore, that court determined that section 10 (a) (2) of the FAA had no role to play in determining whether an award could be vacated due to evident partiality of party-appointed arbitrators, but it said nothing about section 10 (b), which explicitly permits courts "in [their] discretion" to "direct a rehearing" once an arbitral award is vacated.

Furthermore, the plurality's fears that my position, if adopted, would "eliminate the viability of any future arbitration by any MLB club before the RSDC, and place into question the viability of industry-insider arbitrations in general" are entirely unfounded. Presumably, MLB does not regularly place bets on other disputes that come before the RSDC, nor does the Commissioner of Baseball typically make public comments and sworn statements in favor of one party or outcome. And, presumably, other industry insider arbitrations do not

often include egregious showings of bias as presented here. By contrast, as I have stated above, this case involves extraordinary circumstances that necessitate removing this particular matter from the RSDC and MLB's purview.

The plurality may be correct that I "wax[ ] poetic about the purity of the game of baseball," but it misses the point by stating that "MLB is first and foremost a business, governed by its constitution and innumerable agreements and contracts." This case is not solely about business. It is also about arbitration, which, at its core, is about fairness. To be sure, arbitration does not contain the same procedural and evidentiary rules as litigation, and it may be truncated and, at times, not absolutely fair. But it remains an adjudicatory process in which adversaries submit their disputes to relatively impartial decision-makers who are expected to fairly decide matters on the evidence. To say that arbitration is simply a matter of business overlooks its essence as a tool for administering justice outside of the courts.

At bottom, MLB's pervasive bias and unfair conduct has infected the RSDC so as to frustrate the parties' intent to submit their dispute to a fundamentally fair arbitration. Even if the parties' initial choice to arbitrate before the RSDC was not a choice for a totally neutral forum, we must assume that they intended to arbitrate in a forum that offered at least a reasonable level of fairness and impartiality. Because that intent has been frustrated, reformation of the agreement to require a rehearing not administered by MLB or the RSDC is warranted. Therefore, we should substitute our discretion for that of the motion court and direct the parties to submit the subsequent arbitration to the AAA.

ANDRIAS and RICHTER, JJ., concur in a separate opinion by ANDRIAS, J.; KAHN, J., concurs in a separate opinion; ACOSTA, P.J., and GESMER, J., dissent in part in an opinion by ACOSTA, P.J.

Order, Supreme Court, New York County, entered on or about November 4, 2015, affirmed, without costs. Order, same court and Justice, entered July 11, 2016, modified, on the law, to grant the Nationals' motion, and otherwise affirmed, without costs.